(Slip Opinion) OCTOBER TERM, 2021 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BROWN, ACTING WARDEN *v.* DAVENPORT

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 20–826. Argued October 5, 2021—Decided April 21, 2022

Ervine Davenport was convicted of first-degree murder following a jury trial where, at times, he sat shackled at a table with a "privacy screen." On appeal, he argued that his conviction should be set aside in light of *Deck* v. *Missouri*, 544 U. S. 622, in which this Court held that the Fourteenth Amendment's Due Process Clause generally forbids shackling a criminal defendant at trial absent "a special need." *Id.*, at 626. Finding no "special need" articulated in the record, the Michigan Supreme Court agreed that a *Deck* violation had occurred and remanded the case to the trial court to determine under *Chapman* v. *California*, 386 U. S. 18, whether the prosecution could establish that the *Deck* error was harmless beyond a reasonable doubt. On remand, the trial court conducted an evidentiary hearing at which jurors testified that the shackles had not affected their verdict and concluded that the State had carried its burden. Mr. Davenport appealed again, and the Michigan Court of Appeals affirmed the trial court. The Michigan Supreme Court declined review.

Mr. Davenport petitioned for federal habeas relief. The District Court found relief unwarranted under the Antiterrorism and Effective Death Penalty Act of 1996, which limits the power of federal courts to issue habeas relief to state prisoners. See 28 U. S. C. §2254(d). A divided Sixth Circuit panel reversed, declining to analyze the case under AEDPA. Instead, the court held that its review was governed only by *Brecht* v. *Abrahamson*, 507 U. S. 619, which held that a state prisoner seeking to challenge his conviction on the basis of a state court's *Chapman* error must show that the error had a "'substantial and injurious effect or influence'" on the trial's outcome, *id.*, at 637. Persuaded that Mr. Davenport could satisfy *Brecht*, the Sixth Circuit granted federal

habeas relief and ordered Michigan either to retry or release Mr. Davenport. This Court granted certiorari to resolve a circuit conflict about the proper interaction between the tests found in *Brecht* and AEDPA.

*Held*: When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant habeas relief without applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA; the Sixth Circuit erred in granting habeas relief to Mr. Davenport based solely on its assessment that he could satisfy the *Brecht* standard. Pp. 6–25.

(a) When Congress supplies a constitutionally valid rule of decision, federal courts must follow it. In AEDPA, Congress instructed that a federal court "shall not . . . gran[t]" relief with respect to a claim that has been adjudicated on the merits in state court "unless" certain conditions are met. §2254(d). To be sure, the court below in this case was required to ensure that petitioner carried his burden under the terms of *Brecht*. But satisfying *Brecht* is only a necessary condition to habeas relief here; AEDPA must also be satisfied. The Sixth Circuit erred in holding otherwise. Pp. 6–7.

(b) Since the founding, Congress has authorized federal courts to issue habeas writs to federal custodians, and since the Civil War, Congress has extended that authority to include issuance of writs to state custodians. All along, Congress's statutes used permissive rather than mandatory language; federal courts enjoy the "power to" grant writs of habeas corpus in certain circumstances. That structure persists today; federal courts "may" grant habeas relief "as law and justice require." 28 U. S. C. §§2241, 2243.

Under the traditional understanding of habeas corpus, a prisoner could not usually use the writ to challenge a final judgment of conviction issued by a court of competent jurisdiction. But by 1953, this Court had begun to depart from that understanding. In *Brown* v. *Allen*, 344 U. S. 443, 458, it held that a state-court judgment "is not *res judicata*" in federal habeas proceedings with respect to a petitioner's federal constitutional claims. After *Brown*, federal courts struggled with an exploding caseload of habeas petitions from state prisoners.

Eventually, this Court responded by devising new rules aimed at separating the meritorious needles from the growing haystack of habeas petitions. The Court's decision in *Brecht*—which reasoned that *Chapman*'s harmless-error rule for direct appeals was inappropriate for use in federal habeas review of final state-court judgments, 507 U. S., at 633–634—was part of that effort. *Brecht*, like this Court's other equitable doctrines restricting habeas relief, stems ultimately from the discretion preserved by Congress's habeas statutes.

Congress later introduced its own reforms in AEDPA, instructing

that, if a state court has adjudicated the petitioner's claim on the merits, a federal court "shall not" grant habeas relief "unless" the state court's decision was (1) "contrary to" or an "unreasonable application of" clearly established federal law, as determined by the decisions of this Court, or (2) based on an "unreasonable determination of the facts" presented in the state-court proceeding. 28 U. S. C. §2254(d). AEDPA thus left intact the equitable discretion invested in federal courts by earlier federal habeas statutes. Pp. 7–14.

(c) Mr. Davenport's two arguments in defense of the Sixth Circuit's decision lack merit. Pp. 14–21.

(1) Mr. Davenport argues that because the AEDPA inquiry represents a logical subset of the *Brecht* test, the Sixth Circuit necessarily found that he satisfied AEDPA when he satisfied *Brecht*. That argument is mistaken. Proof of prejudice under *Brecht* does not equate to a successful showing under AEDPA. The inquiries under *Brecht* and AEDPA are different. Where AEDPA asks whether *every* fair-minded jurist would agree that an error was prejudicial, *Brecht* asks only whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict. The legal materials a court may consult when answering each test also differ. Where AEDPA requires state-court decisions to be measured against this Court's clearly established holdings, *Brecht* invites analysis based on the whole body of law. Assuming that the Sixth Circuit's analysis was enough to satisfy *Brecht*, it was not enough to warrant eligibility for relief under AEDPA. Pp. 14–16.

(2) Mr. Davenport argues that this Court's precedents in *Fry* v. *Pliler*, 551 U. S. 112, and *Davis* v. *Ayala*, 576 U. S. 257, require a ruling in his favor. But the holding in neither case helps Mr. Davenport, and neither case resolved the question now before the Court. Instead, Mr. Davenport focuses on a brief passage from *Fry*, repeated in *Ayala*—"it certainly makes no sense to require formal application of both tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former," 551 U. S., at 120—that he believes supports the theory that a court may grant relief without applying AEDPA. It does not. In any event, this Court has long stressed that "the language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330. The Court will not override a lawful congressional command on the basis of curated snippets extracted from decisions with no reason to pass on the arguments Mr. Davenport presses here. Pp. 17–21.

(d) Even assuming that Mr. Davenport's claim can survive *Brecht*, he cannot satisfy AEDPA. Mr. Davenport argues the Michigan Court of Appeals' disposition of his shackling claim is contrary to, or an unreasonable application of, this Court's decision in *Holbrook* v. *Flynn*, 475 U. S. 560. *Holbrook* rejected the defendant's claim that he was

denied a fair trial due to the prejudicial effect of supplemental court-room security on the jury. *Id.*, at 562. The language in *Holbrook* Mr. Davenport highlights casts doubt only on attempts to assess trial prejudice based on speculative testimony by prospective jurors. Nothing in *Holbrook* is inconsistent with the Michigan Court of Appeals' reliance on post-trial testimony from actual jurors concerning the effect on deliberations of security measures at Mr. Davenport's trial. Nor did the Michigan court unreasonably apply *Chapman* when it found that the prosecution had established Mr. Davenport's shackling was harmless beyond a reasonable doubt. This Court cannot say that *every* fairminded jurist applying *Chapman* must reach a different conclusion. Similarly, the Court cannot say that every fairminded court would have both identified and adopted Mr. Davenport's forfeited theory that his shackling might have influenced the jury toward a first-degree, rather than second-degree, murder conviction. Pp. 21–25.

964 F. 3d 448, reversed.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, KAVANAUGH, and BARRETT, JJ., joined. KAGAN, J., filed a dissenting opinion, in which BREYER and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–826

MIKE BROWN, ACTING WARDEN, PETITIONER
*v.* ERVINE DAVENPORT

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[April 21, 2022]

JUSTICE GORSUCH delivered the opinion of the Court.

After a state court determines that an error at trial did not prejudice a criminal defendant, may a federal court grant habeas relief based solely on its independent assessment of the error's prejudicial effect under *Brecht* v. *Abrahamson*, 507 U. S. 619 (1993)? Or must a federal court also evaluate the state court's decision under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)? The Sixth Circuit ruled that an individual who satisfies *Brecht* alone is entitled to habeas relief. This was mistaken. When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA.

I
A

One evening in 2007, Annette White attended a gathering with Ervine Davenport. On the drive home, Mr. Davenport killed Ms. White. At trial, the only questions concerned why and how. Mr. Davenport claimed self-defense and testified to that effect. On his account, Ms. White grew

angry during the trip and tried to grab the steering wheel
from him while he was driving. Then she pulled out a box
cutter and cut his arm. Mr. Davenport responded by ex-
tending one arm and pinning Ms. White against the pas-
senger side of the car, with his hand under her chin. Even-
tually, she stopped struggling. On discovering that Ms.
White was no longer breathing, Mr. Davenport panicked
and left her body in a field.

The prosecution offered a very different version of events.
It stressed that Ms. White was 5'2" tall, 103 pounds, and
had a broken wrist, while Mr. Davenport was 6'5" tall and
weighed nearly 300 pounds. The prosecution presented ev-
idence that Mr. Davenport had bragged to others before the
killing that, if he had a problem with someone, he would
choke the person. Days before Ms. White's death, Mr. Dav-
enport had done just that—strangling another woman until
she lost consciousness and urinated on herself. Nor, on the
prosecution's account, were Mr. Davenport's actions after
Ms. White's death consistent with his claim of self-defense.
Instead of contacting the police, he not only abandoned his
victim's body. He also fled the scene and later visited Ms.
White's home where he stole electronics and food. He told
a witness, too, that he "had to off" Ms. White.

The prosecution offered additional proof. When police
questioned Mr. Davenport, he gave differing accounts and
initially denied any involvement in Ms. White's death.
While authorities did locate a box cutter in the car, they did
not find it inside the cab of the vehicle but in the trunk and
untainted by blood. Also, a forensic pathologist testified
that Ms. White died of manual strangulation. The
pathologist explained that a victim of strangulation may
lose consciousness after 30 seconds, but that death does not
occur until the victim is without air for at least four to five
minutes. After Mr. Davenport testified that he merely ex-
tended his arm across Ms. White's neck to keep her from
cutting him, the forensic pathologist offered his view that

this account was not plausible. Ms. White's injuries, found on both sides of her neck, were consistent with strangulation—but inconsistent with the application of broad force across the front of her neck.

After a 7-day trial, a jury convicted Mr. Davenport of first-degree murder.

B

On direct appeal in state court, Mr. Davenport sought to have his conviction set aside in light of *Deck* v. *Missouri*, 544 U. S. 622 (2005). In *Deck*, this Court held that the Fourteenth Amendment's Due Process Clause generally forbids shackling a criminal defendant at trial absent "a special need." *Id.*, at 626. Mr. Davenport noted that during his trial (but not his testimony) officials shackled one of his hands, his waist, and his ankles. Those shackles may not have been visible to many in the courtroom because of a "privacy screen" around the table where Mr. Davenport sat. But the trial court did not articulate on the record any special need for its security measures.

Ultimately, the Michigan Supreme Court agreed that the trial court's actions violated *Deck*. At the same time, the court sought to apply *Chapman* v. *California*, 386 U. S. 18 (1967). In *Chapman*, this Court held that a preserved claim of constitutional error identified on direct appeal does not require reversal of a conviction if the prosecution can establish that the error was harmless beyond a reasonable doubt. *Id.*, at 24. To answer *Chapman*'s question, the Michigan Supreme Court remanded the case to the trial court with instructions to determine whether "the jury saw the defendant's shackles" and, if so, "whether the prosecution can demonstrate beyond a reasonable doubt that the shackling error did not contribute to the verdict against the defendant." *People* v. *Davenport*, 488 Mich. 1054, 794 N. W. 2d 616 (2011).

On remand, the trial court conducted an evidentiary

hearing in which it heard from all 12 jurors. Five remembered seeing Mr. Davenport's restraints; the remaining seven did not. All 12 testified that Mr. Davenport's shackles did not enter into their deliberations or influence their unanimous verdict. Based on this evidence, the trial court found that the State had carried its burden to show harmlessness beyond a reasonable doubt.

Again, Mr. Davenport appealed. This time, Michigan's appellate courts declined to disturb the judgment. For its part, the Michigan Court of Appeals held that "the prosecution proved beyond a reasonable doubt that the shackling error did not affect the verdict." *People* v. *Davenport*, 2012 WL 6217134, \*3 (Dec. 13, 2012) (*per curiam*). In doing so, the court relied on both the jurors' testimony and that "the evidence at trial overwhelmingly established defendant's guilt and belied his contention that he killed the 103-pound victim in self-defense, a theory that was explicitly disputed by expert medical testimony." *Id.*, at \*2, n. 2. The Michigan Supreme Court denied Mr. Davenport's request for discretionary review. *People* v. *Davenport*, 494 Mich. 875, 832 N. W. 2d 389, 390 (2013).

C

Mr. Davenport next sought relief in federal district court, filing a habeas petition in the Western District of Michigan. Under AEDPA, however, a federal court may disturb a final state-court conviction in only narrow circumstances. As relevant here, the statute provides that, when a state court has already ruled on the merits of the habeas petitioner's claim, he must show that decision was either (1) "contrary to" or an "unreasonable application of" clearly established federal law, as determined by the decisions of this Court, or (2) based on an "unreasonable determination of the facts" presented in the state-court proceeding. 28 U. S. C. § 2254(d).

The District Court found relief unwarranted under this

standard. The Michigan state courts had ruled on the merits of Mr. Davenport's claim of error. In doing so, they correctly identified this Court's controlling harmless-error rule from *Chapman*. And their conclusions involved neither an unreasonable application of *Chapman* nor an unreasonable determination of the facts. To the contrary, the District Court agreed with a Magistrate Judge's assessment that the state-court record contained no evidence "that the jurors were influenced" by his restraints and "overwhelming evidence of [Mr. Davenport's] guilt." *Davenport* v. *MacLaren*, 2016 WL 11262506, \*4 (WD Mich., Nov. 7, 2016); see also *Davenport* v. *MacLaren*, 2017 WL 4296808, \*1–\*2 (WD Mich., Sept. 26, 2017) (citing 28 U. S. C. § 2254(d)(1)).

D

After that loss, Mr. Davenport appealed to the Sixth Circuit, where a divided panel reversed. *Davenport* v. *MacLaren*, 964 F. 3d 448 (2020).

Unlike the District Court, the Sixth Circuit declined to analyze the case under AEDPA. Instead, it held, only this Court's decision in *Brecht* v. *Abrahamson* governed its review. Handed down before Congress adopted AEDPA, *Brecht* sought to adapt *Chapman*'s harmless-error rule, developed for cases on direct appellate review, for use in federal habeas proceedings. *Brecht*, 507 U. S., at 633–635. Citing the need to afford appropriate respect to final state-court decisions that have already endured direct appeal, including potential review in this Court, *Brecht* effectively inverted *Chapman*'s burden. 507 U. S., at 635. Rather than require the prosecution to prove that a constitutional trial error is harmless, *Brecht* held that a state prisoner seeking to challenge his conviction in collateral federal proceedings must show that the error had a "'substantial and injurious effect or influence'" on the outcome of his trial. *Id.*, at 637.

Persuaded that Mr. Davenport could satisfy his burden under *Brecht*, the panel majority ordered Michigan to retry or release him promptly. 964 F. 3d, at 464–468.

Judge Readler dissented. He argued that *Brecht* and AEDPA set forth independent tests, and that both must be satisfied before habeas relief becomes permissible. In Judge Readler's view, too, the District Court correctly rejected Mr. Davenport's petition under AEDPA because the state courts hearing his case had not acted contrary to, or unreasonably applied, this Court's decisions. 964 F. 3d, at 469, 478.

The Sixth Circuit denied rehearing en banc by a vote of 8 to 7. *Davenport* v. *MacLaren*, 975 F. 3d 537 (2020). Judges Griffin and Thapar issued dissenting opinions. They expressed agreement with Judge Readler and observed that the panel majority's decision conflicted with those of other circuits where petitioners are required to satisfy both *Brecht* and AEDPA before becoming eligible for habeas relief. 975 F. 3d, at 552 (Thapar, J., dissenting) (citing decisions from the Third, Seventh, Tenth, and Eleventh Circuits). We granted Michigan's petition for certiorari to resolve the conflict in the federal courts of appeals about the proper interaction between these two tests. 593 U. S. ___ (2021).

II

When Congress supplies a constitutionally valid rule of decision, federal courts must follow it. In AEDPA, Congress announced such a rule. It instructed that a federal court "*shall not . . . gran*[*t*]" relief with respect to a claim that has been adjudicated on the merits in state court "*unless*" the state court's decision was (1) "contrary to" or an "unreasonable application of" clearly established federal law, as determined by the decisions of this Court, or (2) based on an "unreasonable determination of the facts" presented in the state-court proceeding. § 2254(d) (emphasis added).

The upshot of these directions for our case is straightforward. No one questions that a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA. See *Davis* v. *Ayala*, 576 U. S. 257, 269 (2015); *Fry* v. *Pliler*, 551 U. S. 112, 119 (2007); *Early* v. *Packer*, 537 U. S. 3, 10–11 (2002) (*per curiam*). No one disputes that such a decision exists here. Nor does Mr. Davenport pursue any claim to relief under § 2254(d)(2). From this, it follows that he must satisfy § 2254(d)(1) to secure federal habeas relief. To be sure, where *Brecht* is implicated a federal court must also ensure a habeas petitioner has carried his burden under its terms before granting relief. But in cases like ours satisfying *Brecht* is only a necessary, not a sufficient, condition to relief. AEDPA too must be satisfied. The Sixth Circuit erred in holding otherwise.

A

Some background helps explain this arrangement. From the founding, Congress authorized federal courts to issue habeas writs to federal custodians. § 14, 1 Stat. 81–82. After the Civil War, Congress extended this authority, allowing federal courts to issue habeas writs to state custodians as well. See Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385. But these statutes used permissive rather than mandatory language; federal courts had the "power to" grant writs of habeas corpus in certain circumstances. That same structure lives on in contemporary statutes, which provide that federal courts "may" grant habeas relief "as law and justice require." 28 U. S. C. §§ 2241, 2243; *Wright* v. *West*, 505 U. S. 277, 285 (1992) (plurality opinion).

Over the centuries, a number of writs of habeas corpus evolved at common law to serve a number of different functions. See *Ex parte Bollman*, 4 Cranch 75, 97–98 (1807); 3 W. Blackstone, Commentaries on the Laws of England 129–131 (1768). But the most notable among these writs was that of *habeas corpus ad subjiciendum*, often called the

"Great Writ." *Id.*, at 131. When English monarchs jailed their subjects summarily and indefinitely, common-law courts employed the writ as a way to compel the crown to explain its actions—and, if necessary, ensure adequate process, such as a trial, before allowing any further detention. See Petition of Right, 3 Car. 1, ch.1, ¶¶ 5, 8 (1628). The Great Writ was, in this way, no less than "the instrument by which due process could be insisted upon." *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 555 (2004) (Scalia, J., dissenting).

At the same time, even this writ had its limits. Usually, a prisoner could not use it to challenge a final judgment of conviction issued by a court of competent jurisdiction. See, *e.g.*, *Opinion on the Writ of Habeas Corpus*, Wilm. 77, 88, 97 Eng. Rep. 29, 36 (K. B. 1758). If the point of the writ was to ensure due process attended an individual's confinement, a trial was generally considered proof he had received just that. See, *e.g.*, *Bushell's Case*, Vaugh. 135, 142–143, 124 Eng. Rep. 1006, 1009–1010 (C. P. 1670).

This traditional understanding extended from England to this country and persisted through much of our history. Asked to apply the Nation's first habeas statute to a duly convicted prisoner, Chief Justice Marshall invoked the common-law rule that a judgment of conviction after trial was "conclusive on all the world." *Ex parte Watkins*, 3 Pet. 193, 202–203 (1830). Acknowledging that Congress had authorized the Court to "inquire into the sufficiency of" the cause of the petitioner's detention, Marshall asked rhetorically, "is not that judgment in *itself* sufficient cause?" *Id.*, at 202 (emphasis added); see also *Ex parte Parks*, 93 U. S. 18, 21–22 (1876); P. Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 465–469 (1963) (Bator).

If the answer was nearly always yes, an important exception existed in both English and American law: A habeas court could grant relief if the court of conviction lacked jurisdiction over the defendant or his offense. See *Watkins*, 3

Pet., at 202–203; Bator 471–472. A perceived "error in the judgment or proceedings, under and by virtue of which the party is imprisoned, constitute[d] no ground for" relief. *Ex parte Siebold*, 100 U. S. 371, 375 (1880). Instead, a habeas court could "examin[e] only the power and authority of the court to act, not the correctness of its conclusions." *Harlan* v. *McGourin*, 218 U. S. 442, 448 (1910). To be sure, the line between mere errors and jurisdictional defects was not always a "luminous beacon" and it evolved over time. Bator 470; *Edwards* v. *Vannoy*, 593 U. S. \_\_\_, \_\_\_ (2021) (GORSUCH, J., concurring) (slip op., at 5). But this Court generally sought to police the doctrine's boundaries in cases involving federal and state prisoners alike.[1]

By 1953, however, federal habeas practice began to take on a very different shape. That year in *Brown* v. *Allen* this Court held that a state-court judgment "is not *res judicata*" in federal habeas proceedings with respect to a petitioner's federal constitutional claims. 344 U. S. 443, 458 (1953). A

––––––––––

[1] See, *e.g.*, *Ex parte Reed*, 100 U. S. 13, 23 (1879) (distinguishing between "erroneous and voidable" and "absolutely void" judgments); see also *Knewel* v. *Egan*, 268 U. S. 442, 445–447 (1925) ("[T]he judgment of state courts in criminal cases will not be reviewed on *habeas corpus* merely because some right under the Constitution . . . is alleged to have been denied to the person convicted"); *Henry* v. *Henkel*, 235 U. S. 219, 228–229 (1914); *Glasgow* v. *Moyer*, 225 U. S. 420, 427–429 (1912); *Markuson* v. *Boucher*, 175 U. S. 184, 187 (1899); *Tinsley* v. *Anderson*, 171 U. S. 101, 106 (1898); *In re Eckart*, 166 U. S. 481, 482–483 (1897); *Bergemann* v. *Backer*, 157 U. S. 655, 658–659 (1895); *Andrews* v. *Swartz*, 156 U. S. 272, 276 (1895); *In re Jugiro*, 140 U. S. 291, 297 (1891); *In re Wood*, 140 U. S. 278, 286–287 (1891); *Ex parte Bigelow*, 113 U. S. 328, 330–331 (1885); *Ex parte Crouch*, 112 U. S. 178, 180 (1884); *Ex parte Parks*, 93 U. S. 18, 21 (1876); 1 H. Black, Law of Judgments §§ 170, 254 (2d ed. 1902); S. Thompson, Void Sentences, 4 Crim. L. Mag. 797, 798–799 (1883). This Court eventually came to view the "limited" class of void judgments to include "(i) convictions based on assertedly unconstitutional statutes" and "(ii) detentions based upon an allegedly illegal [successive] sentence." *Stone* v. *Powell*, 428 U. S. 465, 476, and n. 8 (1976) (citing *Ex parte Siebold*, 100 U. S. 371 (1880); *Ex parte Lange*, 18 Wall. 163 (1874); Bator 465–474).

state court may reject the petitioner's claims after a fair hearing. No appellate court, including this one, may see fit to reverse that final judgment. Yet still, *Brown* suggested, a federal district court approaching the same case years later should be free to decide *de novo* whether the state-court proceedings "resulted in a satisfactory conclusion" and to issue habeas relief if that conclusion is found wanting. *Id.*, at 463; see also *Wright*, 505 U. S., at 287–288 (plurality opinion). The traditional distinction between jurisdictional defects and mere errors in adjudication no longer restrained federal habeas courts. Full-blown constitutional error correction became the order of the day.

This shift did not go unnoticed. Concurring only in the result, Justice Jackson contended that the Court's decision "trivializ[ed] . . . the writ" and was inconsistent with the presumption of finality that traditionally attached to criminal convictions. *Brown*, 344 U. S., at 536, 543. He warned, too, that the Court's ruling threatened "haystack[s]" of new habeas petitions—and that federal courts would struggle to identify the meritorious "needle[s]" among them. *Id.*, at 537. Over the ensuing years, that prediction proved prescient: Federal courts struggled with an exploding caseload of habeas petitions from state prisoners. See, *e.g.*, *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 274, n. 37 (1973) (Powell, J., concurring) ("In 1971 . . . state prisoners alone filed 7,949 petitions for habeas in federal district courts, over 14 times the number filed when Mr. Justice Jackson voiced his misgivings"); B. Garrett & L. Kovarsky, Federal Habeas Corpus 135–136 (2013) (documenting the rise of habeas filings by state prisoners).[2]

———————
[2] The dissent does not dispute that habeas courts refused to engage in full-blown constitutional error correction at the time of the founding. But it contends the practice became the norm by some (unspecified) point in the "mid-19th century." *Post*, at 2–3 (opinion of KAGAN, J.). The dissent's revisionist account contradicts this Court's understanding. See, *e.g.*,

## B

Eventually, this Court responded to the post-*Brown* habeas boom by devising new rules aimed at separating the meritorious needles from the growing haystack. The habeas statutes themselves provided the starting place for these efforts. Recall that Congress invested federal courts

---

*Felker* v. *Turpin*, 518 U. S. 651, 663 (1996) ("[I]t was not until well into this century that this Court interpreted [habeas statutes] to allow a final judgment of conviction in a state court to be collaterally attacked"); *Stone*, 428 U. S., at 475 (in the 19th century, "[t]he writ was extended to state prisoners[,] . . . [b]ut the limitation of federal habeas corpus jurisdiction to consideration of the jurisdiction of the sentencing court persisted"); *id.*, at 476 (*Brown* was a "landmark decision" that "expand[ed]" habeas); *Wright* v. *West*, 505 U. S. 277, 285 (1992) (plurality opinion) ("[B]efore [*Brown*], . . . [a]bsent an alleged jurisdictional defect, habeas corpus would not lie" (internal quotation marks omitted)). The dissent also claims to understand *Brown* better than its contemporaries did, ignoring Justice Jackson's critique as well as Professor Hart's observation that *Brown* "manifestly broke new ground." The Supreme Court 1958 Term—Foreword: The Time Chart of the Justices, 73 Harv. L. Rev. 84, 106 (1959); see also Bator 499–501; W. Duker, A Constitutional History of Habeas Corpus 257–259 (1980); C. Forsythe, The Historical Origins of Broad Federal Habeas Review Reconsidered, 70 Notre Dame L. Rev. 1079, 1166–1168 (1999); 1 B. Means, Postconviction Remedies §§ 4:4, 4:10 (2021). To be sure, the "category of claims deemed to be jurisdictional for habeas purposes" "[g]radually . . . expand[ed]" over time. *Wright*, 505 U. S., at 285 (plurality opinion). But that hardly proves the dissent's ambitious thesis that habeas has, from the mid-19th century, functioned as plenary review for any "constitutional harms" that might lurk behind state-court judgments. *Post*, at 6. In fact, some of the 19th century cases the dissent cites did not even involve challenges to a court's final judgment. See, *e.g.*, *Ex parte Wells*, 18 How. 307, 309 (1856) (challenge to custody under a Presidential pardon that supplanted a court's sentence); *Ex parte Royall*, 117 U. S. 241, 252–253 (1886) (challenge to pretrial custody). Other cases, involving convictions under unconstitutional statutes and successive sentences, treated the judgments at issue as void. See, *e.g.*, n. 1, *supra*; *In re Medley*, 134 U. S. 160, 173 (1890); *In re Nielsen*, 131 U. S. 176, 183–185 (1889). And, as we have seen, 19th-century decisions routinely sought to police the jurisdictional line. *Supra*, at 9, and n. 1. In any event, what we have said remains true: By 1953, habeas had slipped its traditional moorings.

with discretion when it comes to supplying habeas relief—providing that they "may" (not must) grant writs of habeas corpus, and that they should do so only as "law and justice require." 28 U. S. C. §§ 2241, 2243. This language, the Court recognized, serves as "authorization to adjust the scope of the writ in accordance with equitable and prudential considerations." *Danforth* v. *Minnesota*, 552 U. S. 264, 278 (2008); see also *Withrow* v. *Williams*, 507 U. S. 680, 716 (1993) (Scalia, J., concurring in part and dissenting in part). Foremost among those considerations is the States' "powerful and legitimate interest in punishing the guilty." *Calderon* v. *Thompson*, 523 U. S. 538, 556 (1998) (internal quotation marks omitted). Granting habeas relief to a state prisoner "intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Harrington* v. *Richter*, 562 U. S. 86, 103 (2011) (internal quotation marks omitted).

Exercising its equitable discretion, and informed by these concerns, the Court began to develop doctrines "aimed at returning the Great Writ closer to its historic office." *Edwards*, 593 U. S., at ___ (GORSUCH, J., concurring) (slip op., at 8). The Court established procedural-default standards to prevent petitioners from evading independent and adequate state-law grounds sustaining their convictions. *Wainwright* v. *Sykes*, 433 U. S. 72, 86–87 (1977). The Court held that some claims are not cognizable in federal habeas if state courts provide a mechanism for review. *Stone* v. *Powell*, 428 U. S. 465, 494–495 (1976). The Court also applied new rules to prevent cycles of repetitive filings. *McCleskey* v. *Zant*, 499 U. S. 467, 486–493 (1991).

*Brecht* was part of this effort. In *Chapman*, this Court held that, when a defendant demonstrates on direct appeal that a constitutional error occurred at his trial, his conviction cannot stand unless the government proves the error's harmlessness "beyond a reasonable doubt." 386 U. S., at 24. In *Brecht*, the Court resolved that this same standard

was inappropriate for use in federal habeas review of final state-court judgments. 507 U. S., at 633–634. Instead, the Court reasoned, a state prisoner should not receive federal "habeas relief based on trial error unless" he can show the error had a "substantial and injurious effect or influence" on the verdict. *Id.*, at 637 (internal quotation marks omitted). In reaching its judgment, the Court stressed that undoing a final state-court judgment is an "extraordinary remedy," reserved for only "'extreme malfunctions in the state criminal justice system'" and different in kind from providing relief on direct appeal. *Id.*, at 633–634. To allow a federal habeas court to set aside a conviction based on nothing more than "speculation that the defendant was prejudiced by trial error" would be to give short shrift to the State's "sovereign interes[t]" in its final judgment. *Calderon* v. *Coleman*, 525 U. S. 141, 146 (1998) (*per curiam*). Much as the Court had "filled the gaps of the habeas statute with respect to other matters," it found it "necessary to do so" again, in a by-now familiar exercise of its equitable discretion. *Brecht*, 507 U. S., at 633.

C

Three years after *Brecht*, and apparently finding the Court's equitable doctrines insufficient, Congress introduced its own reforms in AEDPA.

In many ways, the statute represented a sea change in federal habeas law. As we have seen, Congress instructed that, if a state court has adjudicated the petitioner's claim on the merits, a federal court "shall not" grant habeas relief "unless" certain conditions are satisfied. § 2254(d). Some of these conditions were new to the law at the time of their adoption; all are demanding. See *Richter*, 562 U. S., at 102.

Still, Congress did not wash away everything that came before. While AEDPA announced certain new conditions to relief, it did not guarantee relief upon their satisfaction.

Instead, Congress left intact the equitable discretion traditionally invested in federal courts by preexisting habeas statutes. So even a petitioner who prevails under AEDPA must still today persuade a federal habeas court that "law and justice require" relief. § 2243. See *Fry*, 551 U. S., at 119; *Horn* v. *Banks*, 536 U. S. 266, 272 (2002) (*per curiam*). And whatever else those inquiries involve, they continue to require federal habeas courts to apply this Court's precedents governing the appropriate exercise of equitable discretion—including *Brecht*. See *Banks*, 536 U. S., at 272; *Johnson* v. *Acevedo*, 572 F. 3d 398, 404 (CA7 2009); see also *Edwards*, 593 U. S., at ___, n. 5 (GORSUCH, J., concurring) (slip op., at 9, n. 5).

Today, then, a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either this Court's equitable precedents or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests. The Sixth Circuit erred when it held Mr. Davenport to just one of these burdens. It granted relief after finding for him on *Brecht*. But it failed to ask the further question whether he satisfied AEDPA. In doing so, the court disregarded Congress's instruction that habeas relief "shall not be granted" unless AEDPA's terms are satisfied. § 2254(d).

### III

Mr. Davenport advances two arguments—one logical, one doctrinal—in defense of the Sixth Circuit's decision. We consider them in turn.

### A

Mr. Davenport first suggests the Sixth Circuit's failure to discuss AEDPA amounted to no more than a forgivable peccadillo. On his account, the AEDPA inquiry represents a logical subset of the *Brecht* test. So even though the Sixth Circuit did not formally find that he satisfied AEDPA, it implicitly did so when it found his case cleared *Brecht*.

This theory is mistaken. Proof of prejudice under *Brecht* does not equate to a successful showing under AEDPA. Instead, the inquiries are "entirely different in kind." J. Greabe, The Riddle of Harmless Error Revisited, 54 Houston L. Rev. 59, 113, n. 297 (2016) (emphasis deleted). They pose courts with different questions to resolve and require courts to answer those questions based on different legal materials.

Take the questions the two tests pose. When a state court has applied *Chapman*, § 2254(d)(1) requires a habeas petitioner to prove that the state court's decision was unreasonable. *Cullen* v. *Pinholster*, 563 U. S. 170, 181 (2011); *Fry*, 551 U. S., at 119. To accomplish that, a petitioner must persuade a federal court that no "fairminded juris[t]" could reach the state court's conclusion under this Court's precedents. *Ayala*, 576 U. S., at 269 (internal quotation marks omitted). Similarly, if a petitioner alleges the state court's decision "was based on an unreasonable determination of the facts" under § 2254(d)(2), it is not enough to show that "reasonable minds reviewing the record might disagree about the finding in question." *Brumfield* v. *Cain*, 576 U. S. 305, 314 (2015) (internal quotation marks and alteration omitted). By contrast, under *Brecht* a petitioner may prevail by persuading a federal court that it alone should harbor "grave doubt"—not absolute certainty—about whether the trial error affected the verdict's outcome. *O'Neal* v. *McAninch*, 513 U. S. 432, 435 (1995). In sum, where AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial, *Brecht* asks only whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict.

Next, consider the legal materials a court may consult when applying the two tests. Section 2254(d)(1) limits habeas relief to cases where a state-court decision contravenes or unreasonably applies "clearly established Federal law, as determined by the Supreme Court of the United States." It

is not enough that the state-court decision offends lower federal court precedents. See, *e.g.*, *Glebe* v. *Frost*, 574 U. S. 21, 24 (2014) (*per curiam*). This Court's dicta cannot supply a ground for relief. See, *e.g.*, *White* v. *Woodall*, 572 U. S. 415, 419 (2014). Nor can holdings that speak only at a high level of generality. See, *e.g.*, *Lopez* v. *Smith*, 574 U. S. 1, 6 (2014) (*per curiam*); *Yarborough* v. *Alvarado*, 541 U. S. 652, 664 (2004). Under AEDPA too, "[s]tate-court decisions are measured against this Court's precedents as of 'the time the state court renders its decision'" and cannot be held unreasonable only in light of later decided cases. *Pinholster*, 563 U. S., at 182 (quoting *Lockyer* v. *Andrade*, 538 U. S. 63, 71–72 (2003)). None of these restrictions applies under *Brecht*. There, a federal habeas court may consult and draw on the whole body of law. So, for example, a petitioner might be able to prevail under *Brecht* thanks to favorable circuit case law but still lose under AEDPA because no comparable holding exists in this Court's precedents.

Today's case illustrates how these differences matter. The Sixth Circuit granted relief to Mr. Davenport after concluding that it harbored grave doubts about the jury's verdict. It did not claim that every reasonable jurist would share its doubts. Nor did it purport to hold that the Michigan state courts had acted contrary to or unreasonably applied a decision of this Court. Instead, the Sixth Circuit said only that the state-court decisions in this case could not be reconciled with a roughly analogous precedent from the Ninth Circuit. 964 F. 3d, at 467. Even assuming the Sixth Circuit's analysis was enough to permit relief under *Brecht*, none of its reasoning was enough to warrant relief under AEDPA. Nor can any of this come as a surprise. As we have seen, if AEDPA makes winning habeas relief more difficult, it is because Congress adopted the law to do just

that.[3]

## B

Failing in his first argument, Mr. Davenport offers an alternative. Even if all we have said is true as a matter of logic, he suggests, we should rule for him anyway as a matter of precedent thanks to *Fry* v. *Pliler*, 551 U. S. 112, and *Davis* v. *Ayala*, 576 U. S. 257.

Here, too, we cannot agree. Start with *Fry*. Because no state court had ruled on the merits of the petitioner's *Chapman* claim, everyone in *Fry* agreed that AEDPA did not apply to his federal habeas petition. Seeking to leverage that fact to his further advantage, the petitioner argued that Congress implicitly swept away this Court's equitable habeas precedents when it adopted AEDPA. 551 U. S., at 119. The upshot? On the petitioner's view, this meant a federal habeas court had to apply *Chapman* (not *Brecht* or AEDPA) to his case. Ultimately, the Court rejected this argument, confirming instead that our equitable precedents remain applicable "whether or not" AEDPA applies. 551 U. S., at

───────────

[3] The dissent attempts to paper over the differences between *Brecht* and AEDPA in two strokes. First, it suggests that asking *Brecht*'s question whether *one* jurist harbors grave doubt about the prejudicial effect of a trial error is effectively the same thing as asking AEDPA's question whether *any* fairminded jurist could reach the *Chapman* decision a state court did. *Post*, at 12–13. Second, to work its way around the fact that *Brecht* and AEDPA require courts to consult different bodies of law, the dissent argues for the creation of a *new* version of *Brecht* in which habeas courts must "confin[e themselves] to using AEDPA-approved materials." *Post*, at 8. Call it *Brecht* 2.0. Neither move succeeds. *Brecht* and AEDPA ask analytically distinct questions—and AEDPA's test alone is statutorily mandated. Until today, too, *Brecht* has permitted courts to consult the full body of law. Besides, if the dissent really believes *Brecht* and AEDPA always lead to the same result, it is unclear why it objects so strongly to our judgment today. The dissent does not quibble with how we apply AEDPA to Mr. Davenport's case. See Part IV, *infra*. And, manifestly, the Court of Appeals did not confine itself to consulting "AEDPA-approved materials," but relied in part on circuit case law to overturn Mr. Davenport's conviction. See *supra*, at 16.

121.

None of this answers the question we face today. Where the petitioner in *Fry* sought to suggest that AEDPA rendered *Brecht* a dead letter, the petitioner here argues nearly the opposite. And the Court's ruling in *Fry* is, if anything, affirmatively unhelpful to Mr. Davenport. Not only did *Fry* hold that this Court's equitable precedents like *Brecht* co-exist side-by-side with AEDPA, it expressly recognized that AEDPA "sets forth a precondition to the grant of habeas relief . . . not an entitlement to it." 551 U. S., at 119–120. Rather than suggest *Brecht* duplicates AEDPA or vice versa, *Fry* thus stands as a reminder that the two tests impose analytically distinct preconditions to relief.

Mr. Davenport offers no persuasive reply. Instead, he invites us to overlook all of this and train our attention to a brief passage at the end of *Fry*'s relevant analysis. There, he notes, the Court said this: "[I]t certainly makes no sense to require formal application of *both* tests (AEDPA/*Chapman* and *Brecht*) when the latter obviously subsumes the former." 551 U. S., at 120. On Mr. Davenport's telling, whatever else *Fry* did or said, this language means it adopted his theory that a court applying *Brecht* necessarily applies AEDPA along the way.

We do not see how we might read so much into so little. Doubtless, there are some cases "when" *Brecht* does "subsum[e]" AEDPA, just as *Fry* says. 551 U. S., at 120. As we have seen, and as was the case in *Fry*, if a state court has not adjudicated the petitioner's claim on the merits, AEDPA falls away. Likewise, if a federal court determines that a habeas petition fails because of *Brecht*, there is no need to prolong the matter by "formal[ly] appl[ying]" AEDPA as well. 551 U. S., at 120. But none of this means, and *Fry* never said, that a *Brecht* inquiry *always* subsumes an AEDPA inquiry. Nor did *Fry* even have reason to consider the relationship between *Brecht* and AEDPA in cases like ours—where a state court has issued a decision on the

merits of the petitioner's claim and AEDPA does apply. To the extent *Fry* had anything to say about *that* scenario, all it said was consistent with what we say today: In such cases, the Court recognized, relief "may not be granted unless the state court's adjudication" was "unreasonable" under AEDPA. 551 U. S., at 119.[4]

That leaves *Davis* v. *Ayala*, where a similar story unfolds. There, the California Supreme Court did rule on the merits of the petitioner's claim: It determined that any federal constitutional errors in his trial-court proceedings were harmless under *Chapman*. *Ayala*, 576 U. S., at 263–264. In later federal habeas proceedings, the Ninth Circuit applied *Brecht*, found prejudice, and granted relief without pausing to consider AEDPA directly. *Ayala* v. *Wong*, 756 F. 3d 656, 674 (CA9 2014). Instead, it asserted, much as Mr. Davenport does, that a favorable finding for a petitioner under *Brecht* necessarily answers AEDPA's distinct inquiry. 756 F. 3d, at 674, n. 13. In the end, however, this Court reversed. We held that the Ninth Circuit misapplied *Brecht* and that a proper *Brecht* analysis precluded relief. Along the way, we indicated that the petitioner could not prove eligibility for relief under AEDPA's demanding standard either.

———————

   [4] As it must, the dissent concedes that *Fry* addressed arguments "differ[ent] from [Mr.] Davenport's." *Post*, at 9. Even so, the dissent latches onto *Fry*'s passing description of AEDPA as "'more liberal'" than *Brecht* and its statement that the latter "'subsumes'" the former. *Post*, at 1, 10, 11, 12. For reasons we have discussed, however, this dicta does not transform *Fry* into a ruling that habeas courts must *grant* relief upon satisfaction of *Brecht* without evaluating the state court's judgment under AEDPA. But there is still another problem with the dissent's attempt to invoke *Fry* as support for its position. Remember, the dissent's claim that *Brecht* duplicates AEDPA depends on a premise wholly alien to the *Fry* Court—a new rule (*Brecht* 2.0) requiring courts applying *Brecht* to consult only "AEDPA-approved materials." See n. 3, *supra*. The dissent's argument thus boils down to an assertion that we should today rewrite one precedent (*Brecht*) and then attribute clairvoyance about our revisions to another past Court (*Fry*).

With nothing in this holding to help him, Mr. Davenport again asks us to focus on a carefully curated snippet. Borrowing language from *Fry*, *Ayala* observed that "a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA." *Ayala*, 576 U. S., at 270 (citing *Fry*, 551 U. S., at 119–120). Again, though, it is hard to see how this much might carry the day. When a federal court determines, as we did in *Ayala*, that a petitioner has *failed* to carry his burden under *Brecht*, that conclusion subsumes (or perhaps more precisely, obviates the need for) a separate AEDPA inquiry; relief must be denied. But none of this resolves the distinct question we face today—whether a petitioner who *can* satisfy *Brecht* also necessarily secures a victory under AEDPA. The *Ayala* Court had no occasion to address that question. And to the extent it spoke to it, it spoke much as *Fry* had, taking pains to reject any suggestion "that *Brecht* somehow abrogates the limitation on federal habeas relief that § 2254(d) plainly sets out." *Ayala*, 576 U. S., at 268.[5]

In the end, Mr. Davenport's appeals to *Fry* and *Ayala* (echoed by the dissent) rest on a misunderstanding of *stare decisis*. At its best, that doctrine is a call for judicial humility. It is a reminder to afford careful consideration to the work of our forbearers, their experience, and their wisdom. But respect for past judgments also means respecting their limits. This Court has long stressed that "the language of

_____

[5] If *Fry* doesn't seal a win for Mr. Davenport, the dissent argues, *Ayala* does the job on its own. *Post*, at 10–12. But *Ayala* does no more than *Fry* to compel the dissent's *Brecht* 2.0 approach. To the contrary, the *Ayala* Court *reversed* a lower court that had overturned a conviction under *Brecht* "'without regard for the state court's harmlessness determination.'" *Ayala*, 756 F. 3d, at 674. It issued a stern reminder that "the highly deferential AEDPA standard applies." *Ayala*, 576 U. S., at 269. And its harmless-error analysis deferred repeatedly to the state court's findings. *Id.*, at 271–285. These are not the actions of a Court that saw *Brecht* as a stand-alone gateway to habeas relief.

an opinion is not always to be parsed as though we were dealing with [the] language of a statute." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 341 (1979). Yet that is exactly what Mr. Davenport and the dissent ask of us. They would have us override a lawful congressional command—that no federal habeas relief should issue "unless" AEDPA's applicable conditions are satisfied. § 2254(d). And they would have us do so on the basis of a handful of sentences extracted from decisions that had no reason to pass on the argument Mr. Davenport presents today. We neither expect nor hope that our successors will comb these pages for stray comments and stretch them beyond their context—all to justify an outcome inconsistent with this Court's reasoning and judgments and with Congress's instructions. Such an exalted view of this Court's every passing remark would turn *stare decisis* from a tool of judicial humility into one of judicial hubris.

IV

Having concluded that the Sixth Circuit erred by failing to apply AEDPA before granting habeas relief, one question remains: Assuming Mr. Davenport can satisfy *Brecht* as the Sixth Circuit held, can he satisfy AEDPA? The answer helps illustrate how the two inquiries are distinct and why a federal court must answer both before overturning a state-court conviction.

Under the statute's terms, we assess the reasonableness of the "last state-court adjudication on the merits of" the petitioner's claim. *Greene* v. *Fisher*, 565 U. S. 34, 40 (2011). In this case, that is the decision of the Michigan Court of Appeals. To be sure, after that intermediate court ruled against Mr. Davenport he sought discretionary review in the Michigan Supreme Court, which denied his request. See 494 Mich., at 875, 832 N. W. 2d, at 390. But a discretionary denial of leave to appeal does not typically entail an "adjudication" of the underlying claim's "merits" under

AEDPA's terms. Instead, it usually represents "a decision by the state supreme court not to hear the appeal—that is, not to decide at all." *Greene*, 565 U. S., at 40; cf. *Ylst* v. *Nunnemaker*, 501 U. S. 797, 805–806 (1991) ("[T]he discretionary denial of review on direct appeal by the California Supreme Court is not even a 'judgment'").

In this respect, the Michigan Supreme Court follows a familiar practice. "The denial of a writ of certiorari" in this Court "imports no expression of opinion upon the merits of the case." *United States* v. *Carver*, 260 U. S. 482, 490 (1923). And the Michigan Supreme Court has long described its denials of applications for leave to appeal in the same terms. See, *e.g.*, *Malooly* v. *York Heating & Ventilating Corp.*, 270 Mich. 240, 246–247, 258 N. W. 622, 624 (1935); see also Mich. Ct. Rules 7.303(B)(1), 7.305(B)(1)–(3) (2021). In the past, too, this Court has treated lower Michigan court decisions as the relevant AEDPA adjudication despite discretionary denials of review by the State Supreme Court. *Woods* v. *Donald*, 575 U. S. 312, 314–315, 317 (2015) (*per curiam*); *Burt* v. *Titlow*, 571 U. S. 12, 20 (2013); *Lafler* v. *Cooper*, 566 U. S. 156, 161, 173 (2012).

Turning to the decision of the Michigan Court of Appeals, Mr. Davenport principally argues that it was contrary to or an unreasonable application of this Court's decision in *Holbrook* v. *Flynn*, 475 U. S. 560 (1986). But it is hard to see how that could be the case. For one thing, *Holbrook* was a decision about whether a constitutional trial error occurred at all, not whether the alleged error was prejudicial. For another, *Holbrook* rejected the defendant's claim that he "was denied his constitutional right to a fair trial whe[n] . . . the customary courtroom security force was supplemented by four uniformed state troopers sitting in the first row of the spectator's section." *Id.*, at 562. Nothing in that analysis is inconsistent with the Michigan Court of Appeals' disposition of Mr. Davenport's shackling claim.

Unable to make use of *Holbrook*'s holding, Mr. Davenport

once more asks us to turn our attention elsewhere. In particular, he notes that the trial court in *Holbrook* asked potential jurors at the outset of trial whether the presence of state troopers would affect their ability to consider fairly the defendant's case; they said no. This Court indicated that such questions and answers cannot alone "dispositive[ly]" resolve the question whether security measures prejudice a defendant's right to a fair trial. *Id.*, at 570. Instead, the Court reasoned that "jurors will not necessarily be fully conscious of the effect [such measures] will have on their attitude toward the accused. This will be especially true when jurors are questioned at the very beginning of the proceedings; at that point, they can only speculate on how they will feel after being exposed to a practice daily over the course of a long trial." *Ibid.* Mr. Davenport highlights that the Court in *Deck* favorably quoted some of these passages too. 544 U. S., at 635.

Even bearing all this in mind, however, we cannot see how the Michigan Court of Appeals acted contrary to or unreasonably applied clearly established federal law. The Michigan court found the shackling in Mr. Davenport's case harmless for two reasons—both because of the "overwhelmin[g]" evidence against him, and because jurors testified that his shackling did not affect their verdict. 2012 WL 6217134, at *1–*2, and n. 2. *Holbrook* does not compel a different ruling on the first score. It addressed a different evidentiary record and affirmed the defendant's conviction.

Nor does the decision compel a different ruling on the second score. *Holbrook* cast doubt only on attempts to assess prejudice based on testimony from prospective jurors speculating about how the security measures might affect their perceptions over the course of an upcoming trial. Nothing in the decision purported to forbid courts from considering post-trial testimony about how trial security measures *actually* affected juror deliberations. Nor may this or any federal court use an AEDPA case as an opportunity to pass on

the wisdom of extending old precedents in new ways. AEDPA permits relief only when a state court acts contrary to or unreasonably applies this Court's preexisting and clearly established rules. See, *e.g.*, *Marshall* v. *Rodgers*, 569 U. S. 58, 64 (2013) (*per curiam*); *Woodall*, 572 U. S., at 424–426; *Lopez*, 574 U. S., at 6.

As a backup, Mr. Davenport suggests that the Michigan Court of Appeals committed an independent error by unreasonably applying *Chapman*. But *Chapman* merely announced the default burden of proof for evaluating constitutional errors on direct appeal: The prosecution must prove harmlessness beyond a reasonable doubt. 386 U. S., at 24. And this Court has repeatedly explained that, when it comes to AEDPA, "the more general the [federal] rule[,] . . . the more leeway [state] courts have in reaching outcomes in case-by-case determinations" before their decisions can be fairly labeled unreasonable. *Renico* v. *Lett*, 559 U. S. 766, 776 (2010) (internal quotation marks and alteration omitted).

The case before us does not come close to exceeding that leeway. The Michigan Court of Appeals properly identified the controlling standard. 2012 WL 6217134, at *1. It then proceeded to find that the prosecution had established Mr. Davenport's shackling was harmless beyond a reasonable doubt in light of the jurors' testimony and the "overwhelmin[g]" evidence that "established defendant's guilt and belied his contention that he killed the 103 pound victim in self-defense, a theory that was explicitly disputed by expert medical testimony." *Id.*, at *1–*2, and n. 2. Even if *some* fairminded jurist applying *Chapman* could reach a different conclusion, we cannot say that *every* fairminded jurist must.

Finally, in a variation on his *Chapman* argument, Mr. Davenport faults the Michigan Court of Appeals for unreasonably focusing on a "false choice between first-degree murder and self-defense." Brief for Respondent 45. In his

view, the state court improperly ignored the possibility that Mr. Davenport's shackling might have influenced the jury toward a conviction for first-degree murder rather than second-degree murder. But Mr. Davenport never presented this theory to the Michigan Court of Appeals. See Brief for Appellant in *People* v. *Davenport*, No. 306868, pp. 22–24 (arguing only that Mr. Davenport's shackling influenced jurors' receptiveness to his self-defense theory). Nor does it directly respond to what the state court called the "overwhelmin[g]" record evidence he committed murder in the first degree. In these circumstances we cannot say that every fairminded court would have both identified and adopted Mr. Davenport's forfeited theory.

\*

Even assuming Mr. Davenport met his burden under *Brecht*, he cannot do so under AEDPA. And a federal court cannot grant habeas relief unless a state prisoner like Mr. Davenport satisfies both this Court's equitable precedents and Congress's statute. The judgment of the Court of Appeals is

*Reversed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–826

_____

## MIKE BROWN, ACTING WARDEN, PETITIONER *v.* ERVINE DAVENPORT

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[April 21, 2022]

JUSTICE KAGAN, with whom JUSTICE BREYER and JUSTICE SOTOMAYOR join, dissenting.

Twice in recent years, this Court has addressed how a federal habeas court is to evaluate whether a state trial error was harmless. See *Fry* v. *Pliler*, 551 U. S. 112, 119–120 (2007); *Davis* v. *Ayala*, 576 U. S. 257, 267–270 (2015). And twice, we have made clear that the habeas court need apply only the standard prescribed in *Brecht* v. *Abrahamson*, 507 U. S. 619 (1993); it need not also run through the test set out in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). That is because, we have both times explained, the *Brecht* standard "obviously subsumes" the "more liberal" AEDPA one: If a defendant meets the former, he will "necessarily" meet the latter too. *Fry*, 551 U. S., at 120; *Ayala*, 576 U. S., at 270.

Today, the Court discards those crystal-clear statements, subscribed to on each occasion by every Justice. The majority reverses the Court of Appeals for following our prior guidance, allowing the use of the *Brecht* test alone. And in declaring *Brecht* insufficient, the majority consigns future habeas courts to a regimen of make-work. Now those courts will have to jump through AEDPA's hoops as well, even though that extra analysis will never lead to a different result. I respectfully dissent from that pointless demand.

## I

Because the majority begins with some law-chambers history, see *ante*, at 7–11, I do too—though fair warning: My discussion is no more relevant than the majority's to the issue before us.  Not surprisingly, neither of the parties to this small and legally mundane case thought it a suitable occasion for a from-Blackstone-onward theory of habeas practice.  Yet the majority, unprompted, embarks on that project, perhaps hoping that the seeds it sows now will yield more succulent fruit in cases to come.  In the majority's story, post-conviction habeas relief was all but unavailable until the mid-20th century—when in an instant the Court in *Brown* v. *Allen*, 344 U. S. 443 (1953), upended the rules. That account repeats the views expressed in a recent concurrence, authored by the same Justice as today delivers the majority opinion.  See *Edwards* v. *Vannoy*, 593 U. S. ___, ___–___ (2021) (GORSUCH, J., concurring) (slip op., at 2–8); *id.*, at ___ (slip op., at 3) (Habeas historically "provided no recourse for a prisoner confined pursuant to a final judgment of conviction").  But the theory, in its fundamentals, is wrong.  Federal courts long before *Brown* extended habeas relief to prisoners held in violation of the Constitution—even after a final conviction.

This Court started reviewing post-conviction constitutional claims under Congress's first grant of habeas authority, included in the Judiciary Act of 1789.  That provision, applying only to federal prisoners, did not specifically provide for collateral review of constitutional claims.  See Act of Sept. 24, 1789, §14, 1 Stat. 81–82 (enabling federal courts to grant habeas writs to "inquir[e] into the cause of [a federal prisoner's] commitment").  But even without explicit permission, the Court in the mid-19th century invoked the habeas law to adjudicate those claims—including some from petitioners already convicted and sentenced.  See 1 R. Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure §2.4[d][i], p. 51 (7th ed. 2020).  In *Ex parte Wells*,

18 How. 307 (1856), for example, only the dissent thought that the fact of a conviction and sentence precluded granting habeas relief (as today's opinion says was the firm rule). See *id.*, at 330 (Curtis, J., dissenting) (asserting that habeas could not aid a person "imprisoned under a [circuit court's] criminal sentence"). The majority, ignoring that objection, scrutinized the merits of the claim in detail before deciding that no constitutional violation had occurred and the applicant should remain in prison. *Id.*, at 315; see *id.*, at 309–315. And in *Ex parte Lange*, 18 Wall. 163 (1874), the Court (again acting under the original habeas law) went further: It granted relief to a convicted prisoner after finding a violation of the Double Jeopardy Clause. The Court explained that it was carrying out a "sacred duty" in declaring that the prisoner was being held "without authority, and [that] he should therefore be discharged." *Id.*, at 178.

When Congress amended the Judiciary Act after the Civil War, the scope of federal habeas review—including over post-conviction claims—grew far larger. The text of the amendment (similar to current law) gave federal courts expansive power: "to grant writs of habeas corpus in all cases where any person may be restrained of his or her liberty" in violation of the Federal Constitution. Act of Feb. 5, 1867, 14 Stat. 385; see 28 U. S. C. §§2241(a), (c)(3). And "any person" in "all cases" meant just that: State prisoners, not just federal ones, could now apply for habeas relief. Those state cases of course involved separate sovereigns, acting under their own laws. But even in that sphere, the Court soon decided that the federal judiciary's authority extended to hearing constitutional challenges to final convictions. Under the new statute, the Court explained, "a single [federal] judge on habeas corpus" could free "a prisoner, after conviction in a State court," upon finding him unconstitutionally restrained. *Ex parte Royall*, 117 U. S. 241, 253 (1886). Or as held in another decision, a "party [was] entitled to a [writ

of ] *habeas corpus*," even after his case "had gone to conviction and sentence," when the state court "ha[d] no constitutional authority or power to condemn" him. *In re Nielsen*, 131 U. S. 176, 184 (1889). A leading treatise of the time summarized the state of the law: A federal court "may, on habeas corpus, release one who is restrained of his liberty in violation of the constitution of the United States, though held under the criminal process of a state court, and either before or after judgment." W. Church, Writ of Habeas Corpus §84, p. 117 (2d ed. 1893).

In line with that view, this Court granted habeas relief, on an assortment of constitutional grounds, to both federal and state prisoners challenging their convictions or sentences. The Court granted post-conviction relief to protect habeas applicants' rights to a grand jury indictment, to a jury trial, to assistance of counsel, and against self-incrimination. See, *e.g.*, *Ex parte Wilson*, 114 U. S. 417, 425–426, 429 (1885); *Callan* v. *Wilson*, 127 U. S. 540, 547–548, 556–557 (1888); *Counselman* v. *Hitchcock*, 142 U. S. 547, 552, 585–586 (1892); *Johnson* v. *Zerbst*, 304 U. S. 458, 467–469 (1938). The Court granted post-conviction relief for violations of the Equal Protection Clause, the Double Jeopardy Clause, and the *Ex Post Facto* Clause. See, *e.g.*, *Yick Wo* v. *Hopkins*, 118 U. S. 356, 373–374 (1886); *Nielsen*, 131 U. S., at 190–191; *In re Medley*, 134 U. S. 160, 170–173 (1890). And as due process rights expanded in the first half of the 20th century, the Court held post-conviction habeas relief proper for those claims too. See, *e.g.*, *Moore* v. *Dempsey*, 261 U. S. 86, 90–92 (1923); *Waley* v. *Johnston*, 316 U. S. 101, 104–105 (1942) (*per curiam*); *Wade* v. *Mayo*, 334 U. S. 672, 683–684 (1948).

The modern Court has repeatedly acknowledged that history. "[O]ver the years," the Court explained (referencing most of the cases cited above), "the writ of habeas corpus evolved as a remedy available to effect discharge from any confinement contrary to the Constitution or fundamental

law." *Preiser* v. *Rodriguez*, 411 U. S. 475, 485 (1973). Or again: Citing *Wells* and *Lange* (among others), the Court described how "judicial decisions [had] expand[ed] the availability of habeas relief" to include challenges to final convictions. *Wainwright* v. *Sykes*, 433 U. S. 72, 79 (1977). Or once more: The Court cited a string of 19th- and early 20th-century cases to illustrate how habeas had expanded to remedy "convictions obtained under an unconstitutional statute" or "without adequate procedural protections for the defendant." *McCleskey* v. *Zant*, 499 U. S. 467, 478 (1991); see also *Schlup* v. *Delo*, 513 U. S. 298, 317–318 (1995) (citing *McCleskey* and *Wainwright* and noting the "broadening of the scope of the writ" to "encompass review of constitutional error" in criminal proceedings).

The majority tries to cram the many habeas decisions belying its position into a narrow jurisdictional "exception," *ante*, at 8—but its effort does no more than reveal the peril of looking at history through a 21st-century lens. In the majority's view, a habeas court could grant relief only "if the court of conviction lacked jurisdiction," not if it committed "errors in adjudication." *Ante*, at 8, 10. But some of the decisions the majority must contend with made no mention at all of the convicting (or sentencing) court's jurisdiction. See, *e.g.*, *Wells*, 18 How., at 308–315; *Yick Wo*, 118 U. S., at 365–374. And those that did so often used the word to mean something different from what it does today. The concept of "jurisdictional defects" (*ante*, at 9) could at that time include—rather than contrast with—constitutional errors of the kind described above.[1] As one legal historian puts the

_____

[1] See, *e.g.*, *Ex parte Wilson,* 114 U. S. 417, 429 (1885) (the lack of a grand jury indictment meant that the court had "exceeded its jurisdiction"); *Callan* v. *Wilson*, 127 U. S. 540, 547, 557 (1888) (a denial of the jury trial right rendered a conviction "void" and "without jurisdiction"); *In re Nielsen*, 131 U. S. 176, 185 (1889) (a sentence violating the Double Jeopardy Clause was "beyond the jurisdiction of the court," because "an

point: The jurisdictional inquiry was then (though of course
not now) often "merits based."  A. Woolhandler, Demodeling
Habeas, 45 Stan. L. Rev. 575, 630 (1993).  That is why this
Court could say in the late 19th century that a court of con-
viction has jurisdiction only "when, in taking custody of the
accused, and in its modes of procedure to the determination
of the question of his guilt or innocence, and in rendering
judgment, the court keeps within the limitations prescribed
by the law."  *In re Bonner*, 151 U. S. 242, 257 (1894).  Or
why a roughly contemporaneous habeas treatise could
state: "[N]o court has jurisdiction to imprison a person or
detain him in custody in violation of the Constitution."  1
W. Bailey, Law of Habeas Corpus and Special Remedies
§25, p. 67 (1913).  So the majority's supposedly narrow ju-
risdictional exception in fact allowed expansive relief: From
the mid-1800s on, federal courts granted habeas writs to
prisoners, federal and state alike, who on the way to convic-
tion or sentence had suffered serious constitutional harms.[2]

  Contrary to the majority, then, our decision in *Brown*
built on decades and decades of history.  No doubt, *Brown*
was significant—a landmark of a kind—because it "made
explicit," and delineated in precise style, the broad scope of

_____

express provision of the Constitution[] bounds and limits all jurisdic-
tion"); *Johnson* v. *Zerbst*, 304 U. S. 458, 468 (1938) (the denial of the right
to counsel is a "jurisdictional bar to a valid conviction").

  [2] A forthcoming article makes much the same point in addressing the
concurrence that anticipated today's historical musings.  See *supra*, at 2;
*Edwards* v. *Vannoy*, 593 U. S. ___, ___–___ (2021) (GORSUCH, J., concur-
ring) (slip op., at 2–8).  Professor Jonathan Siegel writes that the concur-
rence "relies on quotations" invoking a court's jurisdiction "without fully
acknowledging the meaning that they had in their original context.  [It]
incorrectly ascribes to these quotations the meaning they might have if
a court wrote them today.  One must, however, always remember that
'the past is a foreign country; they do things differently there.'  Historical
statements must be understood in their historical context."  Habeas, His-
tory, and Hermeneutics, 64 Ariz. L. Rev. (forthcoming 2022) (draft, at 4),
https://ssrn.com/abstract=3899955 (footnote omitted).

federal habeas. *Wainwright*, 433 U. S., at 79. But the decision, as the leading modern treatise on habeas explains, "worked no revolution." 1 Hertz & Liebman §2.4[d][viii], at 73. Rather, the principles that *Brown* "nicely catalogue[d]" were already "long established, to anyone with the patience to search them out from among the literally hundreds of individually unimportant cases in which they lay dispersed." 1 Hertz & Liebman, at 73–75.[3]

So the majority should not be so sure that it really wishes judicially developed habeas doctrines to "return[] the Great Writ closer to its historic office," *ante*, at 12—at least if that office refers to the longstanding practice of the federal courts under a statute broadly authorizing habeas writs. The majority might then find itself bound to grant habeas relief, with more regularity and less compunction than it would prefer, to address violations of convicted prisoners' constitutional rights.

But let's be frank: My view of the history, just like the majority's, has precious little—no, has nothing—to do with resolving this case. Although it is more entertaining to play

―――――――――

[3] A mountain of other scholarship confirms the treatise's account. See, *e.g.*, J. Siegel, 64 Ariz. L. Rev. (forthcoming 2022) (draft, at 26) ("[T]he distance between nineteenth century habeas practices and those approved in *Brown* v. *Allen* is much smaller than Justice Gorsuch is prepared to acknowledge"); J. Wert, Habeas Corpus in America: The Politics of Individual Rights 142 (2011) (*Brown* "merely formaliz[ed] earlier rules"); E. Freedman, Habeas Corpus: Rethinking the Great Writ of Liberty 139 (2001) ("[O]ne can characterize *Brown* as a watershed only by shutting one's eyes" to developments "under way long before the case was decided"); A. Clarke, Habeas Corpus: The Historical Debate, 14 N. Y. L. S. J. Human Rights 375, 433 (1998) ("Far from constituting a sea change, [*Brown*] merely modernized the language of the law"); S. Saltzburg, Habeas Corpus: The Supreme Court and the Congress, 44 Ohio St. L. J. 367, 382 (1983) ("Was [*Brown*] a departure from prior holdings? The only fair answer is 'no'"); G. Peller, In Defense of Federal Habeas Corpus Relitigation, 16 Harv. Civ. Rights-Civ. Lib. L. Rev. 579, 644 (1982) (*Brown* "did not break any new ground" respecting "the scope of federal habeas review of state court determinations of federal law").

amateur historian, it is past time to put in some work on the technical issue before us: what standard(s) a habeas court should use to decide whether a state trial court's constitutional error was harmless.

## II

Except that little work is in truth necessary—because we have already, and unanimously, resolved that question twice before.

To see how (and why) we have done so, first consider the two possible answers. As the majority frames it, the choice is between (1) applying the *Brecht* standard alone (as Ervine Davenport wants) and (2) applying both *Brecht* and AEDPA (as the State desires). See *ante*, at 1, 14. (Trust me: I will in a moment set out what those standards are.) That formulation of the choice is appropriate as shorthand; indeed, I will use it myself. But it remains an oversimplification. For in arguing that the *Brecht* test suffices, Davenport does not contend that a federal habeas court may simply ignore AEDPA. Although the majority veils the point, Davenport readily acknowledges that a court must always comply with AEDPA's limitation on "the legal materials a court may consult" and "draw on" to justify habeas relief. *Ante*, at 15–16; see Brief for Respondent 16–17 (explaining that a court's *Brecht* analysis is sufficient only if it relies exclusively "on the legal and factual materials allowed" under AEDPA). All Davenport claims is that *if* the habeas court confines itself to using AEDPA-approved materials, *then* it need only find the *Brecht* standard met to grant relief.[4] That means (here, finally, is the *Brecht* stand-

———————
[4] That view does not, as the majority recurrently claims, require "rewrit[ing]" *Brecht* to make it "*Brecht* 2.0." *Ante*, at 19, n. 4; see *ante*, at 17, n. 3, 20, n. 5. The question of what *materials* a court may consider is of course different from the question of what *standard* the court must apply in deciding to grant habeas relief. *Brecht* addresses the legal

ard) the court has to find "actual prejudice"—more specifically, that there is "grave doubt" about whether an error had a "substantial and injurious effect or influence" on a verdict. *Brecht*, 507 U. S., at 637; *O'Neal* v. *McAninch*, 513 U. S. 432, 436 (1995). But no more is required: The court need not, Davenport says, separately apply the AEDPA test. Which means it does not have to analyze (here is the AEDPA test) whether the state appellate court acted "unreasonabl[y]," 28 U. S. C. §2254(d), when it decided, under *Chapman* v. *California*, 386 U. S. 18 (1967), that an error was harmless beyond a reasonable doubt. Is Davenport right?

This Court (first) made clear in *Fry* v. *Pliler* that he is. The question there was whether a federal habeas court should assess harmless error under *Brecht* (rather than *Chapman*) even when the state court had failed to make the harmlessness finding *Chapman* requires on direct review. Justice Scalia, speaking for a unanimous Court, explained why the habeas court should still apply *Brecht*: Use of the defendant-friendly *Chapman* test on habeas would "undermin[e] the States' interest in [the] finality" of convictions. 551 U. S., at 117 (quoting *Brecht*, 507 U. S., at 637). But Fry raised an objection. In recently enacting AEDPA, he claimed, Congress had abolished the *Brecht* test—replacing it with a new AEDPA/*Chapman* standard of review. That argument, of course, differs from Davenport's. See *ante*, at 18. But the Court's reply, in describing the relationship between *Brecht* and AEDPA, answers today's question:

> "Given our frequent recognition that AEDPA limited rather than expanded the availability of habeas relief,

---

standard alone. So *Brecht* could not possibly affect AEDPA's materials requirement—and Davenport properly recognizes as much. But *Brecht* could obviate the need to apply AEDPA's standard—and as I'll describe, this Court has not once but twice made clear that it does.

it is implausible that, without saying so, AEDPA re-
placed the *Brecht* standard of actual prejudice with the
more liberal AEDPA/*Chapman* standard which re-
quires only that the state court's harmless-beyond-a-
reasonable-doubt determination be unreasonable.
That said, it certainly makes no sense to require formal
application of *both* tests (AEDPA/*Chapman* and
*Brecht*) when the latter obviously subsumes the for-
mer." 551 U. S., at 119–120 (citations and internal
quotation marks omitted).

That passage is clear on its face, as Justice Scalia's opinions
typically are. But because the majority pretends it does not
say what it says, see *ante*, at 18–19, it is worth going over.
The key points are two. First, the *Brecht* standard is harder
for a prisoner to meet—*i.e.*, less "liberal"—than the
AEDPA/*Chapman* standard. And second, because that is
so—because *Brecht* so "obviously subsumes" AEDPA/
*Chapman*—it "makes no sense" to require a court to for-
mally apply both. Just apply *Brecht* and be done with it.
Not in "some cases," and not in select "scenario[s]," as to-
day's majority imagines. *Ante*, at 18–19. But as a rule. Be-
cause if a prisoner can satisfy *Brecht*, he can "obviously"
satisfy AEDPA/*Chapman*, and courts should not have to do
needless work.

But we need not take *Fry*'s word for the point, because
the Court in *Davis* v. *Ayala* reaffirmed everything Justice
Scalia said. In *Ayala*, a federal court held on habeas that a
state trial error caused actual prejudice under *Brecht*. This
Court disagreed and reversed, but it made clear that the
*Brecht* test governed. See 576 U. S., at 267 ("In a collateral
proceeding, the test is" *Brecht*'s "actual prejudice" stand-
ard). After describing that standard (with stress on its
strictness), the Court addressed its relation to AEDPA.
*Brecht* in no way "abrogates" AEDPA, the Court noted. 576
U. S., at 268. But the Court explained—several times

over—that *Brecht* makes AEDPA functionally immaterial on matters relating to harmlessness. "In *Fry*," the *Ayala* Court began, "we held that the *Brecht* standard 'subsumes' the requirements that [AEDPA] imposes when a federal habeas petitioner contests a state court's determination that a constitutional error was harmless under *Chapman*." 576 U. S., at 268. Because that is so, *Ayala* continued (again quoting *Fry*), "a federal habeas court need not 'formal[ly]' apply both *Brecht* and 'AEDPA/*Chapman*.'" 576 U. S., at 268 (alteration in original). And if that were not clear enough, the Court reprised: "In sum, a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA." *Id.*, at 270. But still, the Court was not done. In turning to whether the error at issue had caused Ayala harm, the Court noted that he "necessarily" would not satisfy *Brecht* if he had failed to satisfy AEDPA/*Chapman*—which is the flipside of saying he necessarily would satisfy AEDPA/*Chapman* if he had satisfied *Brecht*. 576 U. S., at 270. Both are a function, once again, of *Brecht* "obviously subsum[ing]" AEDPA/*Chapman*.[5]

Today's majority contorts *Ayala*, too, beyond recognition. The majority insists that only a "carefully curated snippet" of that decision—one sentence, in fact—cuts against today's holding. *Ante*, at 20. But see all the quotations above. *Ayala* repeats the key point favoring Davenport—that a court applying *Brecht* need not separately apply AEDPA— multiple times over a span of more than three pages (with the rest of that section providing supportive analysis). See 576 U. S., at 267–270. Similarly, the majority asserts that

——————

[5] Only the *Ayala* Court's application of *Brecht* provoked a dissenting opinion. The dissent explained that its disagreement did "not stem from [the Court's] discussion of the applicable standard of review"—*i.e.*, the *Brecht* standard alone—"which simply restates the holding of *Fry*." 576 U. S., at 291 (SOTOMAYOR, J., dissenting).

the word "subsumes," as introduced in *Fry* and echoed in *Ayala*, does not really mean subsumes—which is to say, fully "encompass[es] as" a "component element." Merriam-Webster's Collegiate Dictionary 1246 (11th ed. 2005). Rather, when the greatest wordsmith in modern Supreme Court history used the term to describe the relationship between two legal tests, he really meant ("more precisely" meant (!), *ante*, at 20) that they merely overlapped—so that sometimes a person meeting one test necessarily meets the other, but then again, sometimes not. If all this shows "respect for past judgments," as the majority declares, *ibid.*, then that phrase too has an unconventional meaning. What *Ayala* held, adhering to *Fry*, was that *anytime* a habeas petitioner satisfies *Brecht*, he of necessity satisfies AEDPA/*Chapman*. And because that is so, a habeas court need not apply both. I hate to assign homework to readers of Supreme Court opinions, but if you don't know what to make of the majority's and my contrasting descriptions of *Fry* and *Ayala*: well, just go read them.

The majority departs from those two decisions because it disagrees with what they said. The straightforward basis of *Fry* and *Ayala*, as just described, is that the AEDPA/*Chapman* test is "more liberal" than the *Brecht* test—*i.e.*, easier for the habeas petitioner to meet. *Fry*, 551 U. S., at 120. (That is why, *Fry* explained, the Congress enacting AEDPA—intent as it was on limiting habeas—could not have meant to replace *Brecht*.) The majority here asserts that this view of the two tests is just not true. Its theory goes: Whereas AEDPA asks whether "*every* fair-minded jurist" would find the requisite prejudice, *Brecht* asks only whether "a federal habeas court *itself*" would do so. *Ante*, at 15 (emphasis in original).

But that description tells only part of the story—and not the most important part. Consider a fuller description of what a habeas court addressing the prejudicial effect of an

error asks under each standard. See *supra*, at 8–9. Applying AEDPA, the court asks whether the state court acted "unreasonabl[y]" in finding (under *Chapman*) that the error was harmless beyond a reasonable doubt—meaning that there is no "reasonable possibility" it "might have contributed to the conviction." 28 U. S. C. §2254(d); *Chapman*, 386 U. S., at 23–24. Applying *Brecht*, the court instead asks whether the error was "actual[ly] prejudic[ial]"—meaning that there is, at a minimum, "grave doubt" about whether an error had a "substantial and injurious effect or influence" on a verdict. *Brecht*, 507 U. S., at 637; *O'Neal*, 513 U. S., at 435–436. The majority is quite right to note that AEDPA's language of reasonableness directs a court to think about how all fairminded jurists would approach a question, while *Brecht* tells a court to decide a question for itself. Cf. *ante*, at 17, n. 3 (somehow still asserting that I "paper over th[is] difference[]"). But what the majority obscures is that those two questions are starkly different. A court doing AEDPA puts a reasonableness overlay on the *Chapman* question; a court doing *Brecht* of course asks the *Brecht* question. And the *Chapman* question—see just above—is far easier for a defendant to prevail on. Accord, *ante*, at 12–13. (That is why the *Brecht* test was created— to better protect the finality of convictions on habeas. See *Brecht*, 507 U. S., at 637–638.) So much easier, indeed, that *Fry* thought it self-evident ("obvious") that even with the AEDPA overlay, the *Chapman* inquiry would require the release of more prisoners. *Fry*, 551 U. S., at 120.

The relationship between *Brecht* and AEDPA/*Chapman* means that today's holding will make no difference to habeas outcomes. Consider a court that has found the *Brecht* test satisfied: It has, at the least, "grave doubt" about the error affecting the verdict. Will that same court say that a reasonable jurist could find no such effect *beyond a reasonable doubt*—that the jurist could deny there was even a "reasonable possibility" of the error mattering? The answer

is no. And that is not just what our precedents say. It is also what the real world shows. Several Circuits formerly followed the rule the majority announces today: Habeas courts there could not grant relief before separately applying *Brecht* and AEDPA/*Chapman*. Yet neither the majority nor the State has come up with a single case (nor have I) in which a court held that a petitioner satisfied *Brecht* but not AEDPA/*Chapman*. Which for all the reasons *Fry*, *Ayala*, and I have given is no wonder. Apply *Brecht* alone or apply both *Brecht* and AEDPA: The same people will, and will not, receive habeas relief.[6]

All today's holding does going forward is compel habeas courts, and the parties before them, to spin their wheels. All it does is what *Fry* observed "certainly makes no sense": require "formal application of [two] tests" when only one— *Brecht*—matters. 551 U. S., at 120. Of course, it is not the worst thing in the world to have to do unnecessary work of this kind; parties and courts alike will find ways to limit the inefficiencies involved. But really, why should they have to? Our prior decisions got the question here right. The courts that have followed their instructions did everything needed. Better, by far, to have left it at that.

---

[6] The decision here does not show otherwise, contra the majority's claim that it "illustrates" how today's apply-both-tests directive "matter[s]." *Ante*, at 16. The only way that claim could be true is if the majority believed Davenport's claim passes the *Brecht* test (and yet fails AEDPA/*Chapman*, as it holds). But the majority believes nothing of the sort. The majority merely indulges the "assum[ption]" that the Sixth Circuit could have found *Brecht* satisfied. *Ante*, at 16, 25. And the majority's analysis shows how far-fetched it thinks that assumption is. Though under the banner of AEDPA, the majority disagrees at every turn with the Sixth Circuit's reasons for granting relief under *Brecht*— both the Sixth Circuit's assessment of the record and its reading of this Court's precedent. See *ante*, at 21–25. No one could read today's opinion and think the majority harbors "grave doubt" that the trial error here affected the verdict.