NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1668
_____

MAURICE TURNER,
Appellant

v.

ADMINISTRATOR NEW JERSEY STATE PRISON; ATTORNEY GENERAL NEW
JERSEY; PROSECUTOR MERCER COUNTY
_____

On Appeal from the United States District Court
For the District of New Jersey
(D.C. No. 3-18-cv-17384)
District Judge:  Honorable Freda L. Wolfson
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 24, 2023

Before:  JORDAN, GREENAWAY, JR., and McKEE, *Circuit Judges*

(Filed April 6, 2023)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Maurice Turner appeals the denial of his habeas petition. He argues that, at his state court trial in New Jersey, a prosecution witness impermissibly implicated him by relating information from a non-testifying co-defendant, in violation of the Confrontation Clause of the Sixth Amendment. Even assuming that a constitutional violation occurred, however, the error was harmless, so we will affirm.

## I.    BACKGROUND

In 2003, William Goldware was robbed and murdered in the home of Turner's co-defendant Karla Freeman, who police found at the scene of the crime crying and covered in blood. A grand jury in Mercer County, New Jersey returned an indictment charging both Turner and Freeman with crimes related to the homicide. The trials for Turner and Freeman were ultimately severed,[1] and both were convicted of the robbery and murder of Goldware.[2] Turner was sentenced to life imprisonment and Freeman to thirty years to life imprisonment.

---

[1] There are some open questions about the procedural history in this case, though they are not relevant here. Turner claims that there were two joint jury trials with co-defendant Freeman before the final, severed trials, and that the first two trials ended in mistrials. He provides no record support for those assertions. (Opening Br. at 3.) Evidently, the New Jersey appeals court had the same experience with him, since it said that, "[a]lthough there is no record support … [Turner] includes in his brief an observation that his first two trials ended in mistrials, the first because of a *Bruton* problem, ... when a witness testified to Freeman's statement implicating him, and the second as a result of a deadlocked jury." *State v. Turner*, No. A-1227-07T4, 2009 WL 3416031, at *4 n.3 (N.J. Super. Ct. App. Div. Oct. 8, 2009). The State does not address the procedural history of this case other than to mention that Turner's jury trial was "bifurcated from [his] co-defendant's case." (Answering Br. at 2.)

[2] Turner was convicted of first-degree murder, first-degree felony murder, and

Freeman gave conflicting stories about what happened that night. Her statements to detectives are set out in detail in *State v. Freeman*, 2010 WL 3611979, at *2-4 (N.J. Super. App. Div. Sept. 10, 2010). At first, she told Detective Timothy Thomas that an intruder came into the house and attacked Goldware, but when Thomas observed no signs of forced entry in the home, Freeman confessed that she had a sex-for-money arrangement with Goldware and stabbed him during a fight after Goldware refused to pay. *Id*. at *2-3. As Thomas was compiling her statement, however, Freeman said, "Detective, that's not what happened. Me and Maurice set him up to rob him, and Maurice stabbed him." *Id*. at *3. When Thomas asked if she was sure, she replied, "No, no, that's not what happened .... I killed him." *Id.* Her story changed again, when, upon meeting Thomas later to give a taped statement, she claimed that she and Turner set up Goldware to rob him and that she did not know that Turner planned to stab Goldware. *Id*. at *3-4. She said that Turner told her to leave her door open so he could enter and rob Goldware. *Id*. at *3. She claimed that she did not think Turner had guns or knives and only thought he was going to "hit [Goldware] in his head and go in his pockets and leave." *Id*. at *4 (alteration in original). She said they planned to split the money "half and half." *Id*. When Turner arrived at the home, Freeman distracted Goldware by kissing him; Turner entered the bedroom and stabbed Goldware three or four times;[3]

first-degree robbery (Counts I, II, and IV); Freeman was convicted of first-degree felony murder and second-degree robbery (Counts II and IV).

[3] A medical examiner testified at trial that Goldware suffered twenty-four stab wounds on his upper body and that the stab wounds, particularly to his lungs and heart,

3

Freeman and Goldware fled to the bathroom where Turner followed them; and Turner "was pulling the door toward him and [Freeman] was pulling the door toward [her] … [and] [t]hat's when [Turner] busted the bathroom door window out[.]" (App. at 11-12 (quoting Freeman's May 25, 2003 Statement at 3) (first and second alterations in original).)

When asked about her contradictory versions of the events, Freeman stated that she "was terrified, and [she] knew [she] had part in robbing [Goldware], but [she] did not know [Turner] was going to stab [Goldware]." *Freeman*, 2010 WL 3611979 at \*4 (third, fifth, and sixth alterations in original). She further stated that she felt guilty and initially accepted blame because if she had not left the door open, Goldware would not have been stabbed. And she was worried about her cousin, Kandis Queen, who had a child with Turner. When asked why this final statement implicating Turner was more reliable than her previous statements, she declared, "[b]ecause I'm willing to take my punishment, but I'm not willing to pay for somebody else murdering. Also, this is the truth about what happened." *Id.* (alteration in original.)

The State did not call Freeman to testify at Turner's trial and did not submit her taped statement into evidence. But the State did call Thomas, who testified about the condition of the crime scene based on his observations shortly after arriving. The crux of this appeal is whether Thomas's testimony improperly incorporated information from Freeman's prior statements that inculpated Turner.

---

were the cause of his death. *Turner*, 2009 WL 3416031, at \*2.

4

Specifically, defense counsel prodded Thomas during cross-examination to describe why he did not think any struggle occurred in the bathroom given the large amount of blood on site:

> [THOMAS:] I believe the struggle, most of the struggle happened in that back part of the bedroom area, because of the blood, the damage to the walls and the cell phone recovery and the ironing board.
>
> [THE DEFENSE:] And that certainly explains why there was blood throughout the entire bathroom, is that correct?
>
> [THOMAS:] That's where [Goldware] went into. He closed the door and started bleeding, and [Turner] was trying to get in. [Goldware] kept bleeding. [Turner] was trying to get in, and that's where [Goldware] lost most of his blood.
>
> [THE DEFENSE:] That's your theory, huh?
>
> [THOMAS:] That's the information I have, yes.

*State v. Turner*, No. A-1227-07T4, 2009 WL 3416031, at *2-3 (N.J. Super. Ct. App. Div. Oct. 8, 2009) (emphasis removed).

Defense counsel did not contemporaneously object to the "[t]hat's the information I have" remark.[4] The day following Thomas's testimony, however, Turner moved for a

_____

[4] Turner also raised an argument for the first time in his reply brief that additional testimony from Thomas on cross-examination was prejudicial. Thomas testified that "[Turner] was a frequent visitor to [Freeman's] residence …", which the defense objected to and which Turner now characterizes as improperly implicating him in the murder. (Reply Br. at 16-17.) Issues raised for the first time in a reply brief are generally forfeited. *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 204 n.29 (3d Cir. 1990) ("As a general matter, the courts of appeals will not consider arguments raised on appeal for the first time in a reply brief."). Regardless, the State withdrew the testimony and line of questioning, and the trial judge's jury instructions expressly told the jurors not to consider any "evidence excluded by the court," including evidence withdrawn after a successful objection. *Turner*, 2009 WL 3416031, at *6.

5

mistrial, "arguing that Thomas's testimony was taken 'almost verbatim' from the statements Freeman provided to police." (App. at 13.) The state trial judge denied the motion, concluding that there was no prejudice because the jury was unaware that Thomas's testimony conformed to one of Freeman's statements and that sufficient evidence in the record supported Thomas's theory. Turner appealed, but the New Jersey Superior Court, Appellate Division, agreed and clarified that it found no Confrontation Clause violation occurred at all. *See Turner*, 2009 WL 3416031, at *5, *14. The New Jersey Supreme Court subsequently denied his petition for certification without an accompanying opinion, and his post-conviction relief petitions were unsuccessful.

Turner then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 with the United States District Court for the District of New Jersey, citing multiple grounds, including a violation of his Sixth Amendment right to confront the witnesses against him. The District Court denied his petition. Turner timely appealed, and we granted a Certificate of Appealability with respect to the Confrontation Clause issue.

## II.    DISCUSSION[5]

Turner's claims were adjudicated on the merits and exhausted in state court proceedings, so the "highly deferential" standards of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply.[6] 28 U.S.C. § 2254(d); *Renico v. Lett*, 559

---

[5] The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254. We have appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

[6] The state appeals court did not engage in a harmlessness analysis typically required under *Chapman v. California*, 386 U.S. 18, 24 (1967), because it found no constitutional error ab initio. *Turner*, 2009 WL 3416031, at *5. Thus, there is no

6

U.S. 766, 773 (2010) ("AEDPA … imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt.") (cleaned up).  Turner is not entitled to a writ of habeas corpus unless the state proceedings

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In addition, habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted).  "Actual prejudice" is "more than a reasonable possibility that the error was harmful." *Davis v. Ayala*, 576 U.S. 257, 267-68 (2015) (internal quotation marks omitted).  "[A]n error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (internal quotation marks and citations omitted).  Our role is to understand as best we can whether constitutional error "substantially influenced the jury's decision." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).  "If, when all is said and done, the court's conviction is sure that the [alleged] error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Id.* at 437

---

"decision" subject to AEDPA deference as it pertains to harmlessness, and we engage in harmless error review pursuant to *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

(cleaned up).  If, on the other hand, we have "grave doubt as to the harmlessness of an error that affects substantial rights, [we] should grant relief."  *Id.* at 445; *see also id.* at 435 ("'grave doubt' … mean[s] that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.").

The Supreme Court has stated that the following factors bear upon harmlessness: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

Here, after review of the record, we do have some reservations about the state courts' conclusion that Turner's trial was not infected with impermissible testimonial hearsay and thus not problematic under the Confrontation Clause.  Thomas testified about facts that went beyond his observation of the crime scene.  For example, Thomas testified about the tussle between Turner and Goldware in the bathroom, saying "[Turner] was trying to get in.  [Goldware] kept bleeding.  [Turner] was trying to get in, and that's where [Goldware] lost most of his blood."  *Turner*, 2009 WL 3416031, at *3.  It is unclear how this account could have been ascertained by merely walking the crime scene.  While it is true that forensic evidence at trial showed Turner's blood on the bathroom doorknob, *id.*, that fact alone does not show a struggle occurred any more than it shows Turner may have merely opened the door with a bloody hand at the crime scene.  *Cf.*, *id.*

8

at *6 (the New Jersey Appellate Division concluding that a struggle was "an entirely proper inference reasonably drawn from the State's DNA evidence.").

Additionally, prior to the bathroom-struggle testimony, the jury heard Thomas testify about interacting with Freeman upon first arriving at the crime scene and receiving then and later multiple, conflicting statements from her.[7] Thus, it is possible that the jury could have suspected that Thomas's testimony was informed by Freeman's account,[8] even if he did not come out and say it.[9] In any event, that would not have been an illogical implication, contrary to the state appellate court's conclusion, *Turner*, 2009 WL 3416031, at *5 ("[N]either [the] defendant nor Thomas specified that Thomas's testimony was derived from Freeman's statements given to police. … The logical implication to be drawn from Thomas's testimony was that 'the information' he had was based on his own physical observations of the scene."). What is more, the jury asked for Freeman's statements during deliberations, although that request was later withdrawn. *Id.* at *5. Turner asserts that this was further evidence that the jury believed that (at least part of) Thomas's testimony was gleaned from Freeman, *id.*; the state court dismissed the

---

[7] The content of Freeman's statements was never revealed by Thomas during testimony.

[8] The jury also heard Thomas testify that the police "started looking for" Turner as a suspect after recording Freeman's statement. (Opening Br. at 15 (quoting trial transcript, District Court Docket Item No. 17 at 161-62).)

[9] Indeed, even the trial judge at sidebar told the prosecutor he was "skating on real thin ice … and h[ad] been for [a] … few minutes" with respect to Thomas's testimony. (App. Vol. 2 at 231.)

connection as "sheer speculation[.]" *Id.* at *5. Considered in totality, however, the defense view is not entirely without foundation.

Finally, the State offered additional facts during summation that could only have come from Freeman's statements: that she lured Goldware to her house with the promise of sex, and that she left the door open for Turner to enter the house and rob Goldware.[10] The State did not call Freeman as a witness to testify about any of these theories, and yet the jury heard them during closing argument without the benefit of adversarial cross-examination.[11]

Against this backdrop, the state trial court considered and rejected Turner's request for a mistrial, reasoning that the defense "opened the door to the complained-of testimony" by asking Thomas for "his theory about what happened"; that there was no

---

[10] These statements are purportedly from the State's summations during closing arguments. Improper statements made in closing arguments are typically subject to prosecutorial misconduct claims. *Gov't of the V.I. v. Mills*, 821 F.3d 448, 456 (3d Cir. 2016) (arguing that prosecutorial misconduct violated the defendant's Fifth Amendment right to due process to receive a fair trial).

[11] While, in his opening brief in this appeal, Turner makes a passing reference to the allegedly improper summation, he waited until his reply brief to introduce the actual trial transcript excerpts. Moreover, Turner has not supplied us with the relevant trial transcripts in the Appendix. Counsel should always provide the Court with materials cited in the briefing. Again, issues raised for the first time in a reply brief are generally forfeited. *See supra* n.4 (citing *Hoxworth*, 903 F.2d at 204 n.29); *see also Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue ... will not suffice to bring that issue before this court.") (internal quotation marks omitted). But, given the weighty Sixth Amendment issues involved, we will consider Turner's belated claim. And we do so without requesting corroboration of the quoted trial transcript or allowing the State to respond because we ultimately decide this case on the ground of harmless error.

10

prejudice because the jury was unaware that Thomas's testimony conformed to one of Freeman's statements; and that there was sufficient scientific evidence in the record to support Thomas's theory. *Turner*, 2009 WL 3416031, at *3. It thus appears that the trial court assessed prejudice and sufficiency of the evidence but did not explicitly decide whether there was constitutional error and, if there was, whether it was harmless.

Under AEDPA, we review the "highest-level state court['s]" decision, which, in this instance, is the New Jersey Superior Court's Appellate Division.[12] *Vazquez v. Wilson*, 550 F.3d 270, 276 (3d Cir. 2008) ("Under the AEDPA we must review the state court proceedings and affirm the denial of the petition unless we are satisfied that [the petitioner] has demonstrated that the … highest-level state court to review the [alleged constitutional error], made a determination that 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" (quoting 28 U.S.C. § 254(d)(1))). The Appellate Division affirmed the trial court but chose a different analytical route by holding that no constitutional error occurred during trial, and thus no harmless error analysis was required. *Turner*, 2009 WL 3416031, at *5. As stated before, we have some doubt about that conclusion, especially in light of *Douglas v.*

---

[12] Although the New Jersey Supreme Court reviewed and denied Turner's petition for certification, the Supreme Court of the United States has held that "a discretionary denial of leave to appeal does not typically entail an 'adjudication' of the underlying claim's 'merits' under AEDPA's terms. Instead, it usually represents 'a decision by the state supreme court not to hear the appeal – that is, not to decide at all.'" *Brown v. Davenport*, ___ U.S. ___, 142 S. Ct. 1510, 1529 (2022).

11

*Alabama*, 380 U.S. 415, 419 (1965), which held that the statements of a non-testifying co-defendant cannot be introduced in trial through the testimony of law enforcement. Nevertheless, we do not have a sufficient doubt that any purported constitutional error at trial caused actual prejudice to Turner.

Assuming without deciding that a trial error of constitutional magnitude occurred, that error was harmless under *Brecht*, given the overwhelming countervailing evidence.[13] Voluminous evidence thoroughly implicated Turner in the crimes. For example, Turner's cell phone, complete with a sticker with his known nickname "Young Reese," was found at the crime scene;[14] Turner's girlfriend, Kandis Queen, testified that she lent Turner her car on the night of the murder and that he left their apartment at 8:00 pm and did not return for five or six hours;[15] the State presented phone records which established that

---

[13] The Supreme Court of the United States has instructed that we are required only to consider the more deferential *Brecht* harmless error standard on collateral review even when the highest-level state court on direct review did not engage in the initial, more defendant-friendly "harmless beyond a reasonable doubt" test under *Chapman v. California*, 386 U.S. 18, 24 (1967), as is the case here. *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (holding "that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* … whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*[.]") "*Brecht* effectively inverted *Chapman*'s burden" and requires the petitioner to now prove that any error had a substantial and injurious effect on the verdict. *Davenport*, 142 S. Ct. at 1519.

[14] The cell phone was registered to Turner's girlfriend, Kandis Queen, who testified that she lent it to Turner on the night of the murder. (App. at 5); *see also Freeman*, 2010 WL 3611979 at *2 (noting in the factual recitation that "'Young Reese[]' [was] a nickname for … Maurice Turner.").

[15] Telephone records established that calls between Freeman and Turner were made between 1:31 a.m. and 2:16 a.m. *Freeman*, 2010 WL 3611979 at *4. A 911 call

five phone calls were exchanged between Freeman and Turner, and eleven between Freeman and Goldware; the State presented a black t-shirt found in Turner's closet with blood on the back hem; testimony was presented about lacerations on Turner's arms when he was arrested a few days after the crime; and a forensic scientist testified that the blood on Turner's black t-shirt was in fact Goldware's, as was the blood found on the gas pedal of the car Turner borrowed from Queen; the forensic scientist also confirmed that Turner's blood was found throughout crime scene (on the front door, top of the stairwell, and the bathroom door knob), and on the steering wheel and dashboard of Queen's car. *Turner*, 2009 WL 3416031, at *2. There was thus a trove of evidence, unconnected with Thomas's testimony, from which a jury could convict beyond a reasonable doubt.

When all is said and done, we are not persuaded that the alleged error had a "substantial and injurious effect" on the jury's verdict. *Brecht*, 507 U.S. at 637.

## III. CONCLUSION

For the foregoing reasons, we will affirm the District Court's denial of habeas relief.

---

was placed at 2:44 a.m. to the City of Trenton reporting an assault in progress at Freeman's home.