**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1886
_____

CLAUDE P. LACOMBE,
                        Appellant

v.

WARDEN JAMES T. VAUGHN CORRECTIONAL
CENTER; ATTORNEY GENERAL DELAWARE

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-17-cv-01518)
District Judge: Honorable Leonard P. Stark

_____

Argued on September 27, 2023

Before: KRAUSE, ROTH, and AMBRO, *Circuit Judges*

(Opinion filed: March 8, 2024)


Richard Coughlin     **[ARGUED]**
Law Office of Caroline Goldner Cinquanto
3331 Street Road
2 Greenwood Square, Suite 450
Bensalem, PA 19020

            *Counsel for Appellant*

Carolyn S. Hake      **[ARGUED]**
Office of Attorney General of Delaware
Delaware Department of Justice
820 N French Street
Carvel Office Building
Wilmington, DE 19801

*Counsel for Appellees*

_____

OPINION

_____

KRAUSE, *Circuit Judge*.

The government, like all of us, must keep its word. This is especially true in the context of plea bargaining, where the government's word leads criminal defendants to surrender a host of constitutional rights. Yet in two different cases today[1] we confront situations where the government fell short.

This opinion concerns Claude Lacombe, who surrendered his rights in exchange for a promise that the government—here the State of Delaware—would recommend a sentence just one year above the mandatory minimum. The State did recommend the promised sentence. But before doing so, it called Lacombe a "gangsta," a "puppet master," and the one who "may as well have" pulled the trigger in a botched robbery that left two dead. App. A at 96. Lacombe, who had bargained for a 22-year sentence recommendation, was ultimately sentenced to life in prison.

Lacombe now appeals the District Court's denial of habeas relief, arguing that the Delaware Supreme Court erred in rejecting his claims that (1) the State breached its plea agreement in violation of *Santobello v. New York*, 404 U.S. 257 (1971), and (2) his counsel was ineffective for failing to demand specific performance of the plea agreement, *see*

_____

[1] Filed contemporaneously with this opinion is *United States v. Cruz*, No. 23-1192 (3d Cir. Mar. 8, 2024), which addresses plea breach in the context of a direct appeal.

2

*Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on those arguments, Lacombe must show that the Delaware Supreme Court unreasonably applied *Santobello* and *Strickland* under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(1), and that he suffered "actual prejudice" as a result of the State's rhetoric and his counsel's failure to object, *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).

As for the AEDPA inquiry, it may be that the State violated the spirit of its agreement by paying mere lip service to the stipulated sentence (and that the Delaware Supreme Court was unreasonable in concluding otherwise). But we need not resolve that issue because, in any event, Lacombe has not established prejudice. Finding any constitutional error harmless under *Brecht*, *Strickland*, and *Puckett v. United States*, 556 U.S. 129 (2009), we will affirm the order of the District Court.

## I. **Background**

### A. Lacombe's Sentencing

On December 26, 2011, Michael Thomas and Keifer Wright drove from Philadelphia to Delaware expecting to sell a quarter pound of marijuana to Lacombe's brother, Paul. But Paul never intended to buy the marijuana. Instead, he and Lacombe had hatched a plan to rob the men and take their drugs at gunpoint. That plan now in motion, Lacombe's girlfriend Christie drove Lacombe, Paul, and Lacombe's friend Elijah to the Harbor Club Apartments in Newark, Delaware. With Lacombe and Christie parked elsewhere, Paul and Elijah met Michael and Keifer at their car and got inside.

Things quickly went south. At some point during the attempted robbery, Paul panicked and shot Keifer in the back of the head with Lacombe's revolver. In the ensuing struggle, Paul also shot Michael several times. Michael was pronounced dead at the scene, and Keifer died a few days later. Lacombe, Paul, Elijah, and Christie fled in Christie's car.

3

The police apprehended Lacombe and Paul, and a New Castle County grand jury returned a 13-count indictment against the two men.[2] The indictment charged each with two counts of first-degree murder, two counts of attempted first-degree robbery, four counts of possession of a firearm during the commission of a felony, and one count of second-degree conspiracy. Paul faced four additional charges for first-degree murder and firearm possession, but in exchange for his agreement to plead guilty but mentally ill to first-degree murder, the State agreed to recommend a life sentence rather than the death penalty. Lacombe pleaded down to one count of second-degree murder, one count of attempted first-degree robbery, one count of possession of a firearm during the commission of a felony, and one count of second-degree conspiracy.

The charges to which Lacombe pleaded guilty carried a mandatory minimum sentence of 21 years and a maximum sentence of life plus 52 years. In exchange for that plea, the State agreed to recommend a sentence of 22 years—again, just one year above the mandatory minimum—followed by Level IV and Level III probation.[3] The Delaware Superior Court accepted Lacombe's plea as knowing and voluntary, and it ordered a presentence investigation to determine the relative culpability of the individuals involved in the shooting.

On September 17, 2013, the Superior Court held a joint sentencing for Lacombe and his brother. After "moving and powerful statements of loss and trauma" from the victims' families, Opening Br. 7, the prosecutor recounted the facts of the case. When the prosecutor finished her overview, the sentencing judge asked for clarification on "how [Lacombe

---

[2] Elijah, who was sentenced the day after Lacombe and his brother, was charged with the same crimes as Lacombe. Christie was charged separately and apparently sentenced alongside Elijah.

[3] Lacombe affirmed in his plea agreement that nobody "promised [him] what [his] sentence [would] be," App. A at 69, and during his plea colloquy he recognized that the State's 22-year recommendation was not binding on the sentencing court. He also recognized that the sentencing court could lawfully impose the maximum sentence of life plus 52 years.

4

and the victims] hooked up and how they knew each other." App. A at 95. The prosecutor answered the question, but she did not stop there; she proceeded to state that Lacombe "was determined to live this lifestyle of this sort of gangsta rapper," and that his rap lyrics "about robbing, shooting, killing, [and] disrespecting women" reflected "a lifestyle that [he] embraced . . . [and] chose to act on . . . when this was all set into play." *Id.* at 96. By way of explanation for these statements, the prosecutor offered the following:

> [W]hen you look at what [Lacombe] physically did, he sat in the car while Paul and Elijah actually went when the robbery and the murder of both Michael and Keifer occurred. But [Lacombe] set all of this in motion. [Lacombe] is the one who put it all into play. [Lacombe] is the one who selected who would be present. [Lacombe] is the one who determined the location. [Lacombe] is the one who determined the time. [Lacombe] is the one who controlled all of this.

*Id.* The prosecutor then continued, describing Lacombe as "the older brother, the mastermind, [and] the puppet master" and concluding: "So don't be fooled when you consider what sentence to give [Lacombe] by the fact that he stayed in the car when this robbery and double homicide occurred. He didn't pull the trigger, but he may as well have, because he set the whole thing in play." *Id.*

Following this commentary, the prosecutor recommended the agreed-upon sentences of life in prison for Paul and "22 years Level V time followed by a lengthy period of probation" for Lacombe. *Id.*

Lacombe's attorneys did not object to the State's monologue. When given the chance to respond, they simply noted that "all the issues the State raised . . . about [Lacombe's] involvement and being the mastermind behind this [were] incorporated in the plea." *Id.* at 99. Given Lacombe's "fairly troubled childhood," the attorneys argued, 22 years was "a reasonable sentence recommendation." *Id.*

5

The sentencing judge disagreed. After emphasizing that "[t]he circumstances are horrible" and "there are no good results from this kind of thing," *id.* at 100, she sentenced Paul to life in prison for first-degree murder and to additional time for second-degree conspiracy. She then turned to Lacombe, noting that while she "wouldn't call [him] the mastermind," he was, based on the record, a "significant factor in the planning and determination of the events that transpired that led to the circumstances as they ended." *Id.* Because the judge saw Lacombe's role, "candidly, as being fairly equal in different respects to that of [his] brother," she sentenced Lacombe to the maximum of life for second-degree murder. *Id.* at 101. She also sentenced him to five years for possession of a firearm during the commission of a felony, five years for attempted first-degree robbery, and two years (suspended) for second-degree conspiracy.[4]

## B.    State Proceedings

In October 2013, shortly after the sentencing hearing, Lacombe filed a motion for modification of sentence. *See* Del. Super. Ct. R. Crim. P. 35(b). In that motion, he argued that (1) the State breached its plea agreement by raising his culpability "from that of a co-conspirator[] to 'mastermind' of [the] whole robbery," and (2) counsel was ineffective for failing to warn him about the possibility of a life sentence. App. A at 180. The Superior Court denied the motion, writing that "the sentence is appropriate for all the reasons stated at the time of sentencing" and that "this [was] not the proper [forum in which] to challenge compliance . . . with the plea agreement or conduct [of] defense counsel." App. B at 9 (capitalization altered).

Undeterred, Lacombe filed a second motion for modification of sentence with similar claims two months later. Although the State opposed the motion, it wrote that it was "not opposed to reconsideration of [Lacombe's] sentence on the Murder Second Degree charge in this case," noting that Lacombe's proposal of 15 to 30 years was "not an

---

[4] The mandatory minimum sentences for these crimes were three, three, and zero years, respectively. The maximum sentences were 25, 25, and two years, respectively.

unreasonable [resentencing] request." App. A at 188. But the sentencing judge remained unmoved. In a letter opinion, she stated that she was "not swayed in the decision to impose sentence on this matter by the State's comments, but [instead] by the facts and the Defendant's conduct." Letter Opinion at 1, *State v. LaCombe*, No. 1201018188 (Del. Super. Ct. Aug. 20, 2014).[5] After recounting that conduct, the sentencing judge concluded that because Lacombe's actions "in the planning and implementation of his design, and in providing the weapon used, reflected a comparable culpability" to Paul, who was sentenced to life, a "comparable sentence" was warranted for Lacombe himself. *Id.* at 1–2.

The Delaware Supreme Court affirmed Lacombe's sentence on direct appeal, rejecting Lacombe's "sole argument" that his life sentence violated the Eighth Amendment "because he received the same sentence as his brother, who was the shooter" and concluding that there was "nothing extreme, or grossly disproportionate, about sentencing a murderer to life in prison." *Lacombe v. State*, No. 560, 2014 WL 2522273, at \*1–2 (Del. May 30, 2014).

In his motion for postconviction relief under Del. Super. Ct. R. Crim. P. 61, Lacombe argued that trial counsel was ineffective for failing to object to the State's plea breach and demand specific performance of the plea agreement.[6] The

---

[5] While certain prior opinions have referred to Lacombe as "LaCombe," we use "Lacombe" throughout this opinion for consistency with the parties' filings.

[6] Although Lacombe had not raised this argument on direct appeal, the Superior Court considered it on the merits. Rule 61 bars relief on "[a]ny ground . . . that was not asserted in the proceedings leading to the judgment of conviction," but it exempts from that bar "colorable claim[s] that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity or fairness of the proceedings." Del. Super. Ct. R. Crim. P. 61(i)(3), (5). As the Superior Court wrote, "[a] claim of ineffective counsel in violation of the Sixth Amendment to the United States Constitution, by its very nature, qualifies" as such a colorable claim. *State v. LaCombe*, 2016 WL 6301233, at \*5 (Del. Super. Ct. Oct. 25, 2016).

Superior Court ultimately denied relief. *See State v. LaCombe*, 2016 WL 6301233, at *8 (Del. Super. Ct. Oct. 25, 2016). Counsel was not ineffective, the Court held, because there was no breach to which to object—the State "recommended the agreed upon sentence of twenty-two years," and it therefore "performed exactly as the terms of the plea agreement stated." *Id.* at *7. Even if counsel's performance was deficient, the Court continued, there was "no prejudice from [the] failure to argue for . . . specific enforcement" because "[t]he State's recommendation [did] not bind the Superior Court." *Id.* at *8; *see Strickland*, 466 U.S. at 687 (holding that ineffective assistance of counsel requires two showings: one, that "counsel's performance was deficient," and two, that "the deficient performance prejudiced the defense"). The Delaware Supreme Court adopted the Superior Court's logic and affirmed. *Lacombe v. State*, No. 542, 2017 WL 2180545, at *5–7 (Del. May 17, 2017).[7]

### C. Federal Proceedings

Lacombe filed a petition for a writ of habeas corpus in the District of Delaware on October 26, 2017. *See* 28 U.S.C. § 2254(a). As relevant here, Lacombe's amended petition asserted that (1) "the State . . . breach[ed] the plea agreement . . . [by] improperly bolstering its theory to increase [Lacombe's] sentence," and (2) "trial counsel was ineffective for failing to require specific performance from the State when

---

[7] Lacombe's subsequent efforts to obtain postconviction relief in the Delaware state courts proved unsuccessful. *See State v. Lacombe*, 2017 WL 6550430, at *2–4 (Del. Super. Ct. Dec. 21, 2017) (second motion for postconviction relief), *aff'd*, No. 22, 2018 WL 1678765 (Del. Apr. 5, 2018); *Lacombe v. State*, No. 204, 2022 WL 4114103, at *1 (Del. Sept. 8, 2022) (third motion for postconviction relief).

the State breached its plea agreement."[8]  *LaCombe v. May*, No. 17-cv-01518, 2021 WL 1342223, at \*1, \*3 (D. Del. Apr. 9, 2021).

The District Court rejected both arguments. Concerning the first, the Court wrote that "the Delaware state courts reasonably determined . . . [the State's remarks] did not constitute a breach of the plea agreement." *Id.* at \*6; *see* 28 U.S.C. § 2254(d)(1).  "[T]he State's responsibility during the sentencing hearing was to recommend capping the sentence at 22 years . . . , which it did," and nothing in the agreement prohibited the State from explaining Lacombe's and Paul's relative roles, nor did the agreement prevent the State from arguing "that a long probation was needed" for Lacombe. *LaCombe*, 2021 WL 1342223, at \*7 (quotation marks omitted). Taken in context, the District Court concluded, the State's rhetoric was not inflammatory, and the Delaware Supreme Court correctly—or at least reasonably—found no plea breach. *See id.* at \*6–7.

Concerning Lacombe's second argument, the District Court concluded that because "the Delaware Supreme Court reasonably . . . applied clearly established federal law in holding that the State did not breach the plea agreement . . . , there was nothing more for trial counsel to seek in terms of specific performance" and counsel's conduct "did not fall below an objective standard of reasonableness." *Id.* at \*10.  It also held that, because the Superior Court "was not obligated to follow the State's sentencing recommendation and had discretion to sentence [Lacombe] to life in prison," the Delaware Supreme Court "reasonably applied *Strickland* in holding that [Lacombe] was not prejudiced by trial counsel's failure to seek specific performance of the plea agreement." *Id.*

---

[8] In total, the amended petition asserted 14 grounds for relief. *LaCombe v. May*, No. 17-cv-01518, 2021 WL 1342223, at \*3 (D. Del. Apr. 9, 2021).  The District Court dismissed eight claims—those raised in Lacombe's second motion for postconviction relief—as procedurally defaulted, *id.* at \*11–13; *see Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000), and it denied relief on the remaining six, *LaCombe*, 2021 WL 1342223, at \*4–11.

Having denied relief on the above claims, the District Court declined to issue a certificate of appealability and dismissed Lacombe's habeas petition without holding an evidentiary hearing. *Id.* at \*13; *see* 28 U.S.C. § 2253(c); 3d Cir. L.A.R. 22.2 (2011). Our Court, however, granted Lacombe's petition for a certificate of appealability with respect to the plea-breach and ineffective-assistance claims, to which we now turn.

## II.   Discussion[9]

Because the District Court ruled on Lacombe's habeas petition without an evidentiary hearing, "we review the state courts' determinations under the same standard that the District Court was required to apply." *Thomas v. Horn*, 570 F.3d 105, 113 (3d Cir. 2009). That standard consists of two inquiries: In weighing whether to grant habeas relief, we must "apply[] both the test [the Supreme] Court outlined in *Brecht* and the one Congress prescribed in AEDPA." *Brown v. Davenport*, 142 S. Ct. 1510, 1517 (2022).

Under AEDPA, we may not grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[10] 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established law when it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result." *Williams v. Taylor*, 529 U.S.

---

[9] The District Court had jurisdiction under 28 U.S.C. §§ 2241 and 2254. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253.

[10] Although we may also grant habeas relief when the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), the parties do not dispute the reasonableness of the Delaware courts' factual findings.

10

362, 405–06 (2000). Similarly, a decision involves "an unreasonable application of" clearly established law when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular . . . case." *Id.* at 407–08. The application must be "objectively unreasonable," meaning that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 409, 411; *see also, e.g.*, *Harrington v. Richter*, 562 U.S. 86, 102 (2011) ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.").

Under *Brecht*, which adds a harmless-error element to our habeas analysis, we must ask two questions for each claim at issue. First, does the claim concern a trial error—meaning an error that "occur[s] during the presentation of the case" to the trier of fact and can "be quantitatively assessed in the context of other evidence presented in order to determine" harmlessness—or a structural defect, which is not susceptible to harmless-error analysis and likely entitles the petitioner to relief? *Brecht*, 507 U.S. at 629–30 (alteration in original) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307–08 (1991)). Second, if the claim concerns a trial error, did that error result in "actual prejudice" to the petitioner? *Id.* at 637 (quoting *Lane*, 474 U.S. at 449); *see Fry v. Pliler*, 551 U.S. 112, 121–22 (2007).

To satisfy his burden of proving "actual prejudice," a petitioner must show that the error "had [a] substantial and injurious effect or influence in determining" the relevant outcome. *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Absent that showing, we will not remedy a claim of trial error on collateral review. *See id.* at 637–38. If the petitioner can make the requisite showing, however, *Brecht* presents no barrier to relief. *Id.*; *see Brown*, 142 S. Ct. at 1517, 1520.

The upshot is that, to prevail on a habeas petition, a prisoner asserting trial error must establish *both* error under AEDPA and prejudice under *Brecht*. *Brown*, 142 S. Ct. at 1517, 1520; *see Freeman v. Superintendent Fayette SCI*, 62 F.4th 789, 802 (3d Cir. 2023); *Mathias v. Superintendent*

11

*Frackville SCI*, 876 F.3d 462, 475 (3d Cir. 2017). Failing to establish either one will preclude habeas relief, so "[w]hen a federal court determines . . . that a petitioner has failed to carry his burden under *Brecht*, that conclusion . . . obviates the need for . . . a separate AEDPA inquiry [and] relief must be denied." *Brown*, 142 S. Ct. at 1528 (emphasis omitted).

Such is the case for Lacombe's plea-breach claim. That claim concerns a trial error, not a structural error, and Lacombe has not carried his burden to show "actual prejudice" under *Brecht*.[11] Similarly, Lacombe has not carried his burden to show prejudice, let alone "actual prejudice," on his *Strickland* claim.

A. Lacombe's *Santobello* Claim

In *Santobello*, the Supreme Court held that "when a plea rests in any significant degree on a promise or agreement of [a] prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." 404 U.S. at

---

[11] Based on this conclusion, we can affirm Lacombe's *Santobello* claim on harmlessness alone. That we do not reach the AEDPA inquiry for this claim, however, does not mean the Delaware Supreme Court's merits determination was necessarily reasonable. The State asserts on appeal that it properly emphasized Lacombe's role to ensure "a long probation." Answering Br. 38. But recall that the State offered its strong language in support of a sentence *just one year above* the statutory minimum. Given the facts here, we question whether fair-minded jurists could conclude that the State's actions comported with the "spirit of [the] agreement." *Dunn v. Colleran*, 247 F.3d 450, 461 (3d Cir. 2001). True, the government "need not endorse the terms of its plea agreements enthusiastically." *United States v. Badaracco*, 954 F.2d 928, 941 (3d Cir. 1992) (quotation marks omitted). And AEDPA's standard is no doubt difficult to meet. *See, e.g.*, *Harrington*, 562 U.S. at 102–03; *Renico v. Lett*, 559 U.S. 766, 773 (2010). But the government also may not introduce its agreed-upon terms with a wink and a nod. *See Cruz*, slip op. at 7–8; *see also, e.g.*, *United States v. Canada*, 960 F.2d 263, 269–71 (1st Cir. 1992); *United States v. Taylor*, 77 F.3d 368, 369–71 (11th Cir. 1996).

262. Lacombe argues here, as he did before the District Court, that (1) the State failed to fulfill its promise by implicitly advocating for a sentence longer than 22 years, and (2) the Delaware Supreme Court unreasonably applied *Santobello* when it reached the opposite conclusion. He also contends that the Delaware Supreme Court erred in considering prejudice because we have treated *Santobello* errors "as akin to structural defects not susceptible [to] harmless error analysis." Reply Br. 6 (quoting *Dunn v. Colleran*, 247 F.3d 450, 463 (3d Cir. 2001)). Lacombe makes the third argument under AEDPA,[12] but it is equally relevant for purposes of *Brecht*. Assuming we begin our analysis with *Brecht* and harmless error—as we elect to do here—a conclusion that *Santobello* violations are structural defects would foreclose our consideration of prejudice.

Whether *Santobello* violations are trial errors or structural defects was, until today, an open question in our Circuit. In *Dunn*, a plea-breach case decided on AEDPA grounds, the majority observed that "[t]he Supreme Court and this Court have, on direct appeal, regularly treated *Santobello* errors as akin to structural defects" and that "[n]othing in recent Supreme Court caselaw" suggested a different conclusion on habeas review. 247 F.3d at 451, 463. The dissent, meanwhile, pointed out that the Supreme Court has never identified plea breach as within the "limited class" of structural defects and that "there is a strong presumption against finding . . . a given type of violation [to be] structural." *Id.* at 470 (Cowen, J., dissenting) (quotation marks omitted); *see Neder v. United States*, 527 U.S. 1, 8 (1999); *Johnson v. United States*, 520 U.S. 461, 468–69 (1997). Ultimately, however, we had no reason

---

[12] In Lacombe's view, the Delaware Supreme Court "contradict[ed] the governing law" set forth in *Santobello* when it framed its analysis "in the context of the need to prove prejudice occasioned by the breach." *Williams*, 529 U.S. at 405; Opening Br. 28. Even if *Santobello* prohibited harmless-error analysis, this argument would lack merit: The Delaware Supreme Court stated that it considered prejudice only under *Strickland*, *see Lacombe*, 2017 WL 2180545, at *6, and a contrary reading would be out of step with "the respect AEDPA requires us to afford our state counterparts," *Eizember v. Trammell*, 803 F.3d 1129, 1143 (10th Cir. 2015).

13

to resolve the issue, because "even if harmless error would apply to a *Santobello* violation," the error in *Dunn* was not harmless. 247 F.3d at 463.

Today, we confront the issue again with the benefit of "recent Supreme Court caselaw." *Id.* Eight years after *Dunn*, the Supreme Court decided *Puckett v. United States*, 556 U.S. 129. In that case, the government conceded on direct review that it had violated the terms of the plea agreement. *Id.* at 133. Because defense counsel failed to object to the plea breach at sentencing, however, the government argued that (1) plain-error review was appropriate for the unpreserved claim, and (2) Puckett could not show prejudice as required under the plain-error standard. *Id.*; *see* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 734–35 (1993). Puckett countered that even if plain-error review was appropriate, consideration of prejudice was not, because *Santobello* deemed plea-breach claims to be structural defects. *See Puckett*, 556 U.S. at 140. The Supreme Court disagreed, explaining:

> [B]reach of a plea deal is not a "structural" error as we have used that term. We have never described it as such, and it shares no common features with errors we *have* held structural. A plea breach does not necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence; it does not defy analysis by harmless-error standards by affecting the entire adjudicatory framework; and the difficulty of assessing the effect of the error is no greater with respect to plea breaches at sentencing than with respect to other procedural errors at sentencing, which are routinely subject to harmlessness review.

*Id.* at 141 (citations and quotation marks omitted). The Court also clarified that, while "*Santobello* did hold . . . automatic reversal is warranted when objection to the Government's breach of a plea agreement has been preserved," that holding

14

rested on policy concerns.[13]  *Id.*  Those policy concerns and "the rule of contemporaneous objection," the Court said, are "equally essential and desirable, and when the two collide [there is] no need to relieve the defendant of his usual burden of showing prejudice." *Id.*

Puckett, then, stands for two propositions.  First, plea breach is not a structural defect that defies analysis by harmless-error standards.  Second, at least where there is no contemporaneous objection, *Santobello*'s automatic-reversal rule does not apply, and prejudice is relevant to a plea-breach claim.

Although *Puckett* dealt with plain-error review, its reasoning applies with equal force on habeas review.  Just as a defendant "must make a specific showing of prejudice" to prevail in the plain-error context, *Olano*, 507 U.S. at 735, a habeas petitioner is "not entitled to habeas relief based on trial error unless [he] can establish that [the error] resulted in 'actual prejudice,'" *Brecht*, 507 U.S. at 637 (quoting *Lane*, 474 U.S. at 449).  And we see no reason why the contemporaneous-objection rule—which is enough to overcome *Santobello*'s automatic-reversal rule in the context of plain error—should

---

[13] As the *Dunn* majority emphasized, the *Santobello* Court remanded the case despite evidence of harmlessness.  *Dunn*, 247 F.3d at 463; *see Santobello*, 404 U.S. at 262–63.  The *Puckett* Court explained, however, that it did so not because "plea-breach errors are (like structural errors) somehow not susceptible, or not amenable, to review for harmlessness," but instead based on "a policy interest in establishing the trust between defendants and prosecutors that is necessary to sustain plea bargaining—an essential and highly desirable part of the criminal process."  556 U.S. at 141 (emphasis omitted) (quotation marks omitted).

15

have any less force in the habeas context.[14] On collateral review too, then, a "defendant whose plea agreement has been broken by the Government will not always be able to show prejudice, either because he obtained the benefits contemplated by the deal anyway . . . or because he likely would not have obtained those benefits in any event." *Puckett*, 556 U.S. at 141–42. Because *Santobello* violations are not structural defects, and because *Puckett*'s logic extends to habeas, we hold that without a contemporaneous objection, an alleged *Santobello* violation is a trial error susceptible to harmless-error review under *Brecht*.

We qualify our holding with an important caveat. *Puckett* concluded that *Santobello* violations are amenable to harmless-error analysis when there is no contemporaneous objection, because in that scenario there is a "colli[sion]" between the "essential and desirable" contemporaneous-objection rule and the "policy interest in establishing . . . trust between defendants and prosecutors . . . necessary to sustain plea bargaining." 556 U.S. at 141. In the scenario where there *is* a contemporaneous objection, and so that collision is avoided, the *Puckett* Court explicitly declined to "confront . . . the question [of] whether *Santobello*'s automatic-reversal rule has survived [the] recent elaboration of harmless-error principles in such cases as *Fulminante* and *Neder*." *Id.* at 141 n.3. We adopt the same approach here, and we take no position on whether harmless-error analysis is appropriate—on habeas

---

[14] Indeed, the policy considerations weighing against automatic reversal are even greater when (1) there is no contemporaneous objection, and (2) the case reaches federal court under 28 U.S.C. § 2254. In *Brecht*, the Supreme Court wrote that "[o]verturning final and presumptively correct convictions on [habeas] review . . . undermines the States' interest in finality and infringes upon their sovereignty over criminal matters." 507 U.S. at 637. The same logic, we believe, applies to "final and presumptively correct" sentences. *Id.*

review, direct appeal, or elsewhere—for *Santobello* violations where counsel lodges a timely objection.[15]

Here, it is undisputed that Lacombe's attorneys did not object to the State's rhetoric, so *Brecht*'s harmless-error rule governs.[16] And because Lacombe has not established "actual prejudice," that rule is dispositive. Even if the State breached the plea agreement, the sentencing judge was not bound by the State's recommendation, had independent access to information about Lacombe's and Paul's respective roles in the crimes, and indicated at sentencing that she was not swayed by the State's rhetoric. *See* App. A at 100–01 ("I wouldn't call you the mastermind, but, nonetheless, a significant factor in the planning and determination of the events that transpired . . . . I see your role, candidly, as being fairly equal in different respects to that of your brother . . . ."). In addition, and tellingly, the sentencing judge reaffirmed Lacombe's life sentence *even after* the State agreed that a reduction to 15 to 30 years was reasonable, writing that her original sentence was based solely on "the facts and the Defendant's conduct."[17] Letter Opinion, *supra*, at 1. Lacombe thus cannot show that the State's purported overreach had a "substantial and injurious

---

[15] Had there been a contemporaneous objection here, the State could of course have attempted to cure the breach. *See Cruz*, slip op. at 8–10. But as *Cruz* confirms, "it [remains] an open question whether we may excuse . . . errors as harmless" in that scenario. *Id.* at 11.

[16] Lacombe did not forfeit his plea-breach claim despite his counsel's failure to object, instead preserving it (via an ineffective-assistance claim) in his Rule 61 motion. Because the Delaware Supreme Court reviewed the claim on the merits rather than for plain error, *see Lacombe*, 2017 WL 2180545, at *1–2, we need not concern ourselves with questions of procedural default or exhaustion, *see Picard v. Connor*, 404 U.S. 270, 275 (1971).

[17] Although it is possible that the State's words unconsciously influenced the sentencing judge, and that once the State said its piece the bell could not be unrung, the sentencing judge gave assurances to the contrary, and ignoring those assurances would be out of step with the principles of comity and federalism underlying federal habeas review. *See Brecht*, 507 U.S. at 635.

effect or influence" on the Superior Court's sentence, *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776); *see Puckett*, 556 U.S. at 141–42, or that there is "grave doubt about whether [the] trial error" affected the outcome, *see Davis v. Ayala*, 576 U.S. 257, 267–68 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).[18] We conclude that any error here was harmless under *Brecht*,[19] and we will affirm the District Court's denial of relief on Lacombe's *Santobello* claim without reaching the AEDPA inquiry. *See Brown*, 142 S. Ct. at 1528.

### B. Lacombe's *Strickland* Claim

Having disposed of Lacombe's *Santobello* claim on harmless-error grounds, the resolution of Lacombe's *Strickland* claim is fairly straightforward. As for this claim, we begin (and end) with AEDPA.

To sustain an ineffective-assistance claim under *Strickland*, a defendant must show that (1) counsel's performance was deficient, meaning that it "fell below an objective standard of reasonableness," and (2) the deficient performance "prejudiced the defense," meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687–88, 694. Lacombe argues that the Delaware Supreme Court erred at both prongs of this analysis and unreasonably applied *Strickland* because, assuming a breach, it (1) failed to consider counsel's deficient failure to object, and

---

[18] *See also, e.g.*, *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam) ("The social costs of retrial or resentencing are significant . . . . The State is not to be put to this arduous task based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.").

[19] As the Supreme Court clarified in *Puckett*, "the question with regard to prejudice is not whether [a defendant] would have entered the plea had he known about the future violation." 556 U.S. at 142 n.4. Instead, "[w]hen the rights acquired by the defendant relate to sentencing, the outcome he must show to have been affected is his sentence." *Id.* (quotation marks omitted).

(2) concluded there was no prejudice "because the sentencing court was not bound by the State's recommendation." *Lacombe*, 2017 WL 2180545, at *6.

Even assuming the State breached its plea agreement, we agree with the Delaware Supreme Court that counsel's failure to object or demand specific performance was harmless.[20] For the same reason we lack "grave doubt" as to whether the alleged plea breach affected the outcome (that is, the absence of "actual prejudice"), we do not believe the Delaware Supreme Court unreasonably applied *Strickland* when it concluded Lacombe's sentence would have been the same regardless of counsel's actions. Lacombe's *Strickland* claim therefore fails under AEDPA, and we will affirm the District Court's denial of relief on this claim as well.

## III.    Conclusion

Because Lacombe is not entitled to habeas relief for either claim at issue on appeal, we will affirm the order of the District Court.

---

[20] We take no position on whether the State actually breached the plea agreement for purposes of *Strickland*. *See Strickland*, 466 U.S. at 697, 700 (noting that, because "[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats [an] ineffectiveness claim," a court can "dispose of [the] claim on the ground of lack of sufficient prejudice" alone).

19